UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
DEC 2 3 2005
U.S.D.C. S.D. N.Y.

———————————————————— x

In re PRESTIGE BRANDS HOLDINGS, INC. :
SECURITIES LITIGATION                              :
———————————————————— :
                                                            :
This Document Relates To:                         :
                                                            :
        ALL ACTIONS.                                 :
———————————————————— x

Master File No. 7:05-cv-06924-CLB

CLASS ACTION

Amended
~~CONSOLIDATED~~ **CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiff Teamsters Affiliates Pension Plan ("TAPP") and Plaintiffs The City of Tallahassee Pension Plan ("Tallahassee"), Charter Township of Clinton Police and Fire Retirement System ("Charter") and Jose R. Vazquez ("Vasquez"), collectively with TAPP, Tallahassee and Charter, the "Plaintiffs") assert the following allegations, except as to allegations specifically pertaining  to Plaintiffs and Plaintiffs' counsel, based upon the investigation undertaken by Plaintiffs' counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Prestige Brands Holdings, Inc. ("Prestige" or the "Company"), press releases and other public statements issued by the Company, interviews with former employees of the Company and media reports about the Company, and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons, other than Defendants, who purchased Prestige common Stock (the "Class") from February 9, 2005 (the "IPO") through November 15, 2005 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. This Court has jurisdiction of this action pursuant to §27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337. and 28 U.S.C. §§1331 and 1337.

3.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

4.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

5.      Lead Plaintiff TAPP purchased Prestige common stock pursuant and/or traceable to the IPO, as defined herein, as set forth in the certification previously submitted in this litigation, which is incorporated by reference herein.

6.      Plaintiff Tallahassee purchased Prestige common stock pursuant and/or traceable to the IPO, as defined herein, as set forth in the certification previously submitted in this litigation, which is incorporated by reference herein.

7.      Plaintiff Charter purchased Prestige common stock pursuant and/or traceable to the IPO, as defined herein, as set forth in the certification previously submitted in this litigation, which is incorporated by reference herein.

8.      Plaintiff Vasquez purchased Prestige common stock during the Class Period, as set forth in the certification previously submitted in this litigation, which is incorporated by reference herein.

9.      Defendant Prestige is a Delaware corporation with its principal executive offices in Irvington, New York.  Prestige describes itself as a seller of "well-recognized, brand name over-the-counter drug, household cleaning and personal care products."

10.     Defendant GTCR Golder Rauner, LLC ("GTCR") is a private equity firm with offices in Chicago, IL.   In April 2004, GTCR and its affiliates, led a leveraged buy-out transaction of Prestige's predecessor corporations.   Prior to the IPO, GTCR, through its affiliates and related entities, held an 85% equity interest in Prestige.   More than $196 million of the proceeds from the IPO were used to retire Prestige class B preferred units owned by GTCR and to repurchase Prestige common shares owned by GTCR.   In addition, GTCR, and its affiliates, were the beneficial owners of 7,737,109 shares of Prestige common stock that were sold in the IPO, generating proceeds of more than $123.8 million.   In total, GTCR garnered more than $319.8 million from the IPO.

11.     (a)     Defendant Peter C. Mann ("Mann") was, at all relevant times, President, Chief Executive Officer and a Director of Prestige.   Mann signed the Registration Statement (defined below) or it was signed for him by an Attorney-in-Fact.   Mann sold 304,145 shares of Prestige common stock in the IPO, for which he received approximately $4.9 million.

(b)     Defendant Peter J. Anderson ("Anderson") was, at all relevant times, Chief Financial Officer and a Director of Prestige.   Anderson signed the Registration Statement or it was signed for him by an Attorney-in-Fact.   Anderson sold 123,758 shares of Prestige common stock in the IPO, for which he received approximately $2.0 million.

(c)     Defendant David A. Donnini ("Donnini") has served as a manager and a director of the Company since its inception.   Donnini signed the Registration Statement or it was signed for him by an Attorney-in-Fact.   Donnini was also a Principal of defendant GTCR.

(d)     Defendant Vincent J. Hemmer ("Hemmer") has served as a manager and a director of the Company since its inception.   Hemmer signed the Registration Statement or it was signed for him by an Attorney-in-Fact.   Hemmer was also a Principal of defendant GTCR.

(e)     Defendants Mann, Anderson, Donnini and Hemmer are collectively referred to herein as the "Individual Defendants."

(f)     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment bank which acted as the lead underwriter for the IPO.

(g)     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank which acted as one of the underwriters for the IPO.

(h)     Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is an investment bank which acted as one of the underwriters for the IPO.

(i)     Defendants Merrill Lynch, Goldman Sachs and J.P. Morgan are collectively referred to as the "Underwriter Defendants."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

12.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons who purchased the common stock of Prestige from February 9, 2005 through November 15, 2005.  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

13.     The members of the Class are so numerous that joinder of all members is impracticable.  Approximately 32.2 million shares of Prestige common stock were sold in the IPO. The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Prestige or its transfer agent or the Underwriters.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a

form of notice similar to those customarily used in class actions arising under the federal securities laws.

14.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

15.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

16.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

17.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether the Prospectus (defined below) and Registration Statement issued by Defendants to the investing public in connection with the IPO omitted and/or misrepresented material facts about Prestige and its business;

(c)     Whether Defendants' statements issued during the Class Period were materially false and misleading; and

(d)     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

18.     Prestige sells well-recognized, brand name over-the-counter drug, household cleaning and personal care products.  Among other brands, the Company makes *Comet* brand cleansers, *Spic and Span*, *Chloraseptic* cough remedies, *Murine* eye drops, *Prell* shampoo and *Compound W* wart remover.  According to Prestige, by operating in "niche segments of these products categories," the Company is able to use the strength of the brands, established retail distribution network, a low-cost operating model and experienced management team as a competitive advantage to grow presence in these categories and, as a result, grow sales and profits.

19.     Prestige groups its products into three reportable business segments: Over-the-Counter medicines ("OTC"), Household Cleaning products and Personal Care products.  Based on the Company's most recent financial data available prior to the IPO, Prestige's net sales were purportedly $224.9 million for the nine months ended December 31, 2004.  Of this total, the OTC segment accounting for 54% of total net sales and the Household Cleaner segment accounted for 34%.  According to Prestige, during this period two brands accounted for more than 42% of the Company's gross revenues: *Comet* with $65.4 million and *Compound W* with $34.5 million.

20.     In April 2004, Prestige was formed as the result of a leveraged buyout ("LBO") transaction orchestrated by defendant GTCR in a transaction valued at $860 million.  LBOs are acquisitions in which the buyers use a significant amount of borrowed capital to take over companies.  After gaining control of Prestige (the "Bonita Bay acquisition"), GTCR merged Prestige with Medtech Products Inc. ("Medtech") and The Spic and Span Company, which GTCR acquired in February 2004.  Following the merger, GTCR owned more than 85% of Prestige's equity.

## GTCR Takes Prestige Public Through the IPO

21.     In July 2004, just four months after the merger, GTCR was angling to recoup its investment in Prestige through an initial public offering of Prestige income deposit securities ("IDS").  IDSs are hybrid securities that graft an interest-paying subordinated debt to a piece of common stock.  In theory, at least, investors are supposed to receive a blended yield consisting of dividends on the shares and interest on the debt.  According to an article published by _The New York Times_,  dated July 25, 2004, certain unidentified investment bankers described the best candidates for issuing investment deposit securities as companies with relatively **_secure and stable markets and low capital spending requirements_** since these attributes can help smooth the cash flows needed to maintain dividend and interest payments.

22.     On or about July 28, 2004, Prestige filed with the SEC a registration statement on Form S-1 covering the offering of as much as $920 million in IDS (the "July 28 Form S-1").  The July 28 Form S-1 represented that Prestige intended to use a portion of the proceeds to retire some of the $660 million debt Prestige incurred as a result of the LBO and to use the balance to redeem Prestige preferred stock held by GTCR.

23.     In the July 28 Form S-1, Defendants emphasized that Prestige was an ideal candidate for an IDS offering.  Indeed, at the top of a list of Prestige's "Competitive Strengths," the July 28

Form S-1 described the Company's strong operating margins and stable cash flows, stating in pertinent part as follows:

> Our leading brands and efficient operating model enable us to generate strong operating margins and *stable cash flows*.  Our operating model, which focuses on our core competencies and outsources non-core functions to third parties, enables us to benefit from third-party economies of scale in manufacturing, warehousing and distribution.  *We are therefore able to maintain* low overhead and a highly variable cost structure with low working capital investment and *negligible capital expenditures*.  [Emphasis added.]

24.     Before Prestige finalized the IDS offering, the Company pulled it in the face of proposed disclosure regulations.  According to news reports, the SEC was proposing to require companies to base their expected cash distributions, critical to the IDS yields touted in marketing materials for the securities, on future earnings rather than past earnings, and that issuers disclose the risks attendant to a decline in earnings and the impact such a decline would have on IDS yields.  In the face of the proposed disclosure requirements, many companies, including Prestige, abandoned their IDS offerings.

25.     On or about November 12, 2004, Prestige filed an amended registration statement withdrawing the proposed IDS offering and downsizing the offering to approximately $400 million of Prestige common stock (the "November 12 Form S-1").  Interestingly, the November 12 Form S-1 excluded in its entirety the representations concerning Prestige's "stable cash flows," previously touted as one of the Company's primary "competitive strengths" when the Company was attempting to market the IDS offering.  The November 12 Form S-1 was amended several times thereafter.

26.     Then, on February 9, 2005, Prestige filed with the SEC a Form S-1/A registration statement (the "Registration Statement") for the IPO.  On that same day, the prospectus (the "Prospectus"), which forms part of the Registration Statement, became effective and 32,200,000 shares of Prestige common stock were sold to the public, thereby raising approximately $515.2

million.   Of the $515.2 million raised, approximately $130.6 million went to certain selling shareholders, including defendants GTCR, Mann and Anderson.

**The Prospectus Was Materially False and Misleading**

27.      The Prospectus issued in connection with the IPO was materially false and misleading for several reasons.

28.      **<u>Materially False and Misleading Financial Statements</u>**.  As detailed herein, the Prospectus included financial statements which were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and which materially overstated the Company's historical operating results and financial condition for the fiscal years ended March 31, 2003 and 2004 and the nine months ended December 31, 2004.  On November 15, 2005, Prestige announced that it would be restating its historical financial results for the fiscal years ended March 31, 2003, 2004, 2005 and the first quarter of fiscal 2006, ended June 30, 2005 thereby admitting that the financial statements included in the Prospectus were materially false and misleading.

29.      On November 15, 2005, Prestige issued a press release announcing that it was restating its financial statements in order to correct more than three years of revenue and earnings misstatements, which resulted in a cumulative overstatement of Prestige's "net sales" of nearly $22 million through the first quarter of fiscal 2006.  The Company admitted that its financial statements did not comply with GAAP and that, among other things, Prestige was prematurely recognizing revenue on virtually all of its product sales.  The press release stated in pertinent part as follows:

> As a result of a review of certain accounting practices performed in conjunction with the Company's assessment of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002, the Company determined it may have erroneously applied generally accepted accounting principles as they relate to the recognition of revenue, the classification of certain trade promotion allowances, and the computation of earnings per share.  At the direction of the Audit Committee of the Company's Board of Directors, an independent review of these issues was performed.

Management and the Audit Committee concluded that, ***in light of the accounting errors discussed above, the financial statements for the years ended March 31, 2005, 2004 and 2003 and the quarterly data for the years ended March 31, 2005 and 2004 included in the Company's Annual Report on Forms 10-K and 10-K/A for the year ended March 31, 2005 and the financial statements for the quarters ended June 30, 2005 and 2004 included in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005 should no longer be relied upon***.

\*      \*      \*

With respect to revenue recognition, Staff Accounting Bulletin No. 104 sets forth the criteria for revenue recognition, one of which is that risk of loss has passed to the customer.  The Company, consistent with its published pricing and shipping terms, has historically recognized revenue upon shipment of product to the customer.  ***Upon closer examination of its shipping practices and terms, the Company determined that it often was unclear when, from a legal standpoint, risk of loss of its products passed to its customers.  Accordingly, the Company has concluded that revenue should not be recognized until product is received by its customers*** (referred to as "FOB destination point"), unless the risk of loss transfers to the customer at the point of shipment.

With respect to the classification of trade promotions and allowances, Emerging Issues Task Force Issue 01-09 sets forth the criteria for classifying such promotions and allowances as an expense or a reduction of revenue.  Upon review, the Company determined that it had incorrectly classified certain promotion and allowance amounts as expense rather than as a reduction of revenue.  [Emphasis added.]

30.      The Company reported materially inaccurate financial statements to prospective investors in the Registration Statement, which presented historical results for the nine months ended December 31, 2004 and for fiscal years ended March 31, 2004 and 2003 in violation of GAAP.  The following chart illustrates the magnitude of the GAAP violations and their effects on the Company's previously reported "net sales" revenue and net income:

| Restated Amounts | Originally Reported in Form S-1/A | | | Originally Reported in Form 10-K | | | Form 10-Q | |
|---|---|---|---|---|---|---|---|---|
| (000's omitted) | FY 2005 (9 mos) | FY 2004 | FY 2003 | FY 2005 | FY 2004 | FY 2003 | FY 2006 (3mos) | FY 2005 (3mos) |
| Revenue misstatement | 13,201 | 2,642 | 4,705 | 14,249 | 2,642 | 4,705 | 102 | 9,002 |
| **% of restated revenues** | **6.23%** | **3.10%** | **6.56%** | **6.73%** | **3.10%** | **6.56%** | **0.16%** | **15.32%** |
| Net Inc Loss misstatement | 1,746 | 191 | 474 | 3239 | 191 | 474 | $1,922 | $1,955 |
| **% of restated income or loss** | **14.63%** | **6.07%** | **3.18%** | **31.69%** | **6.07%** | **3.18%** | **32.42%** | **27.57%** |

31.    A section of the Prospectus, entitled "Summary Historical Financial Data of Prestige Holdings and Predecessor," presented audited financial statements for the Company's fiscal years ended December 31, 2003 and 2004, among others, as well as unaudited interim financial statements for the nine months ended December 31, 2004 for fiscal year 2005.

32.    The Prospectus represented that the Company's consolidated revenues for the nine months ended December 31, 2004 were $224.957 million and that the Company's net income was $13.683 million. For fiscal year ended March 31, 2004 the Prospectus represented that Prestige's revenues were $87.920 million and its net income was $4,183 million. For the fiscal year ended March 31, 2003, the Prospectus represented that the Company's revenues were $76.439 million and its net loss $14.422 million.

33.    The Prospectus represented that the Company's historical financial statements were prepared in accordance with GAAP.  The Prospectus also identified certain "critical accounting policies," including the Company's revenue recognition policy which represented that Prestige recognized revenue in accordance with GAAP.  The Prospectus stated in pertinent part as follows:

### *Basis of presentation of unaudited interim financial information*

The unaudited consolidated financial information herein has been prepared in accordance with accounting principles generally accepted in the United States of America. In the opinion of management, the financial statements include all adjustments, consisting only of normal recurring adjustments that are considered necessary for a fair presentation of the Company's financial position, results of operations and cash flows for the interim periods. Operating results for the three and nine months ended December 31, 2004 are not necessarily indicative of results that may be expected for the entire year.

***Revenue Recognition****.* For sales transactions, we comply with the provisions of Staff Accounting Bulletin 104 "Revenue Recognition", which states that revenue should be recognized when the following revenue recognition criteria are met: (1) persuasive evidence of an arrangement exists; (2) the product has been shipped and ***the customer takes ownership and assumes the risk of loss***; (3) the selling price is fixed or determinable; and (4) collection of the resulting receivable is reasonably assured.  These criteria are satisfied upon shipment of product and revenues are recognized accordingly.  [Emphasis added.]

- 11 -

34.     The statements referenced above in ¶¶32-33 were each materially inaccurate as they negligently misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)     that Prestige had recognized sales revenues in violation of GAAP and the Company's own accounting policies when it recorded revenues upon shipment of products to customers prior to the customers' assumption of risk of loss for the products. Defendants have now admitted that the Company's revenues were materially overstated by millions of dollars for the interim periods of fiscal year 2005 and fiscal years 2004 and 2003 as presented in the Prospectus due to these recurring GAAP violations;

(b)     that the Company reported certain trade promotions and allowances as expenses rather than reductions to revenue in violation of GAAP and the Company's own accounting policies. Defendants have now admitted that the Company's revenues were materially overstated by tens of millions of dollars for the interim periods of fiscal 2005 and fiscal years 2004 and 2003 as presented in the Prospectus due to these GAAP violations;

(c)     that for the nine months ended December 31, 2004, the Company's revenues were actually $211.756 million and not $224.957 an overstatement of $13.201 million (*see* ¶30 and chart) and the Company's net income for that period was actually $11.937 and not $13.683 million as represented in the Prospectus;

(d)     that for the fiscal year ended March 31, 2004, the Company's revenues were actually $85.278 million and not $87.920 an overstatement of $2.642 million (*see* ¶30 and chart) and the Company's net income for that period was actually $4.374 million and not $4.183 million as represented in the Prospectus;

(e)      that for the fiscal year ended March 31, 2003 the Company's revenues were actually $71.734 million and not $76.439 million an overstatement of $ 4.705 million (*see* ¶30 and chart) and the Company's net loss for that period was actually $14.896 million and not $14.422 million as presented in the Prospectus;

(f)      that Prestige recognized sales revenue during the month of December 2004 in violation of GAAP and the Company's own accounting policies when it recorded revenue on sales of products that included contemporaneous concessions, *i.e.*, the Company's agreement to provide customers with "chargebacks" for any unsold inventory.  The recognition of revenue in these instances violated GAAP because the selling price for the products was not fixed or determinable and collection of the resulting receivable was not reasonably assured; and

(g)      based on the foregoing, as detailed herein at ¶¶96-125, Prestige's financial statements were not prepared in accordance with GAAP and therefore were materially false and misleading when issued.

35.      **Misrepresentations Concerning Key Products and Customer Relationships**.  As detailed herein, the Prospectus affirmatively misrepresented demand for certain of the Company's key products, failed to disclose that demand for those products was in material decline, contained material misrepresentations concerning the market position of the Company's products and omitted information necessary to allow investors to determine that those market positions could not be maintained.  The Prospectus further contained material misrepresentations and omitted material information concerning the Company's key customer relationships, especially with Wal-Mart.

36.      At the time of the IPO, Prestige was experiencing declining demand for its *Compound W* brands, including Freeze Off, which Defendants repeatedly highlighted as one the Company's' leading growth products.  In fact, however, based on inventory and point-of-sale reports from the

Company's largest customer Wal-Mart, at the time of the IPO, retail sales of *Compound W* Freeze Off had been steadily declining resulting in millions of dollars of lost sales to the Company. According to a former senior executive of Prestige, by December 2004, it was apparent to the Individual Defendants that the Company would not be able to meet its forecasted results due in part to declining Freeze Off sales.

37.     In late December 2004, in order to offset these declining sales, the Individual Defendants and certain of the Company's senior sales executives arranged for a $4 million sale of Freeze Off products to Wal-Mart and granted Wal-Mart the right to return any excess inventories of Freeze Off after the Company's fiscal year end on March 31, 2005 (the "December 2004 Freeze Off Sale"). As detailed below, Wal-Mart did return approximately $2 million of the December 2004 Freeze Off sale products during the calendar quarter ended June 30, 2005. Defendants have never disclosed the consignment nature of the December 2004 Freeze Off Sale, but instead attributed the losses incurred as a result of the product returns to "inventory overhang" at one of Prestige's major customers. This announcement was made on July 28, 2005, causing the Company's stock to decline more than 40% in value. As detailed herein, the Company's recognition of revenue in connection with the December 2004 Freeze Off sale to Wal-Mart violated GAAP and the Company's publicly stated revenue recognition policy.

38.     According to two former employees of the Company who had personal knowledge of the December 2004 Freeze Off Sale and who both confirmed, among other things, that at the time of the IPO, the large sale of Freeze Off to Wal-Mart in December 2004 was an effort to artificially inflate product sales prior to the IPO and that at the time of the IPO, Defendants knew that Wal-Mart was not selling the product and would be returning the product as soon as it was able to do so.

39.    **_Confidential Informant 1_** ("CI 1") – CI 1 was employed by Prestige from January 1999 to March 2005.  CI 1 was a senior executive involved in the day-to-day operations of the Company with direct responsibilities for both the OTC medicines product segment and Personal Care segment.  CI 1 had regular interactions with the Individual Defendants and had personal knowledge of the circumstances surrounding the December 2004 Freeze Off Sale.

40.    CI 1 stated that in December 2004 Prestige was below its forecasted "December numbers" and that the Individual Defendants "looked to the sales guys to get the numbers." According to CI 1, Prestige's chief sales officer Gerard Butler ("Butler") and his sales group went out to customers in order to secure additional product orders and came back with Wal-Mart's "interest in a large order of *Compound W Freeze-Off*."  CI 1 stated that he knew that the sale included a concession that Prestige would accept Wal-Mart's return of any excess or unsold inventories.  Specifically, CI 1 stated that Wal-Mart had agreed to keep excess inventories of *Compound W* past the Company's fiscal year end, March 31, 2005, but had a right to return excess inventories after that time.  CI 1 estimated that the December sale of *Compound W* was in excess of $4 million or roughly ten times Wal-Mart's average monthly purchase volume.  CI 1 stated that Prestige had access to a vendor-managed inventory system ("VMI") and could see Wal-Mart's inventory levels at any time.  CI 1 confirmed that the *Compound W* products didn't sell well at Wal-Mart during Prestige's fourth quarter (the calendar quarter ended March 31, 2005) and that prior to the IPO Wal-Mart had approached Prestige for the return of as much as fifty percent of the December 2004 sale amount or $2 million.

41.    CI 1 explained the financial problems facing Prestige as a result of the Wal-Mart product returns.  CI 1 stated that "[i]n addition to having to back out revenues on the returns" another financial problem with the *Compound W* Freeze Off returns was that "it is an FDA regulated

product.  Once the product comes back on a return, it has to be destroyed and cannot be resold."  CI 1 stated that Prestige had to write down the value of the returned inventory, as well as absorb the freight cost for the returns.

42.     CI 1 further explained that by March 2005 Prestige had many brands that were struggling with sales, "the company was trying to figure out how to deal with the sales."  When asked if there were particular brands that were doing especially poorly compared with projected sales, CI 1 said the OTC and Personal Care product groups alone carried 28 different brands, and that Prestige was struggling with the *Comet* brand in particular.

43.     **_Confidential Informant 2_** ("CI 2") – CI 2 was employed by Prestige from October 2002 to April 2005, as Director of National Accounts whose primary responsibilities included co-managing a Wal-Mart information system known as "Wal-Mart Retail Links."  The Wal-Mart Retail Links system was designed to review, plan and order merchandise for all of Wal-Mart's warehouses and provide hourly inventory and point-of-sale information from each of Wal-Mart's retail stores. As one of at least two Prestige national account directors for Wal-Mart, CI 2 reported directly to senior sales executives at Prestige, including Butler, the Company's chief sales officer, who in turn reported directly to defendant Mann.  According to CI 2, Butler had regular daily meetings with defendant Mann.

44.     In the months immediately preceding the IPO, CI 2 was instructed by Butler to identify "opportunities to increase sales" by maintaining "100% in-stock inventory replenishment" of Prestige products at each of Wal-Mart's retail stores.  In order to do this CI 2, using the Wal-Mart Retail Links Systems, followed a procedure known as the "Store Specific Order" protocol which allowed certain of Wal-Mart's vendors, including Prestige, to "order and/or change orders" placed by Wal-Mart's buyers for Prestige's products.  In particular, CI 2 recalled a "large supply" of

*Compound W Freeze-Off* products which were shipped to Wal-Mart in late December 2004. Subsequently, CI 2 learned from Butler that because of recent poor sales results for the *Freeze-Off* product, Wal-Mart's chief buyer for footcare products, Steve Reinemund, had exacted certain concessions from Prestige in order to complete the large December 2004 sale. In particular, CI 2 was told by Butler that Wal-Mart had agreed to "allow Prestige to keep inventory" at Wal-Mart through March 31, 2005, on the condition that Prestige provided Wal-Mart with a "chargeback for all inventory overhang" after that date.

45. According to CI 2, based on reports from the Wal-Mart Retail Links system, poor retail sales results for *Compound W Freeze-Off* and other Prestige products at Wal-Mart stores continued unabated throughout January and February 2005. Nevertheless, CI 2 stated that Butler "constantly" instructed CI 2 and other account directors to order and ship Prestige products "that were never going to sell," resulting in the additional overstocking of Wal-Mart's warehouses. According to CI 2, due to Prestige's "abusive" ordering and shipping practices during January to March 2005, carried out on Butler's instructions, Reinemund contacted Prestige and threatened to cut-off Prestige's access to Wal-Mart's ordering systems.

46. In addition, to the problems with *Compound W* the Prospectus failed to disclose known adverse trends concerning the Company's *Comet* brand products and that its marketing strategies had severely strained certain of Prestige's customer relationships.

47. ***Confidential Informant 3*** ("CI 3") – CI 3 worked for Prestige from December 1999 until November of 2004. CI 3 was a Vice President of Sales Development with responsibility for sales administration and sales development. CI 3 had account responsibility over all major national accounts and international sales. CI 3 was directly responsible for handling the Wal-Mart and K-Mart accounts and "dealt across all product lines." CI 3 stated that he also had "broker

responsibility" in the Midwest.  CI 3 explained that Prestige used brokers who worked on commission to sell to local retail food chains or supermarkets.  CI 3's responsibilities included sales of all Prestige product lines to all customers with the exception of Wal-Mart.  With respect to Wal-Mart, CI 3 had responsibility for sales of household cleaning products such as *Comet* and *Spic and Span*.  While at Prestige, CI 3 reported directly to chief sales officer Butler.  CI 3 stated that Butler reported directly to defendant Mann.  CI 3 confirmed that *Comet* was the Company's leading selling product in terms of gross sales and estimated that Wal-Mart accounted for approximately 30% to 40% of Prestige's sales of all *Comet* brand products.

48.  Following the acquisition of the *Comet* brand by Prestige in April 2004, CI 3 stated that all of Prestige's brands suffered from a lack of attention by its sales force due to a lack of organization and understaffing.  CI 3 stated that due to understaffing "80% of the product-line" was ignored and the sales force concentrated on "only the top products" because the sales force was over-worked.  According to CI 3, this was caused by Prestige's eliminating approximately one-third of its commissioned sales force (outside brokers) in an effort to save money on commissions.  CI 3 stated that the brokers primarily dealt with the retail food chain customers and accounted for approximately 25% of the sales revenue.  ***CI 3 also explained that Prestige was experiencing sales declines during the third quarter of fiscal 2005 [the calendar quarter ended December 31, 2004] due to the fact that it had reduced the amount of money that the sales force could use for advertising or on "buy down" promotions***.  CI 3 stated that Prestige's predecessor, Bonita Bay, budgeted an amount equal to approximately 5% of the sales revenue for this purpose, but Prestige reduced the amount to roughly 2.5%.  According to CI 3, this angered the buyers at Wal-Mart because less advertising and fewer promotions usually resulted in decreased sales for the chain.  CI 2 also stated that in addition to a decrease in sales of "ancillary" brands such as *Prell* and *Denorex*, based on point-of-sales

reports obtained from Butler, *CI 3 noted a 10% drop-off in sales of Comet abrasive cleaner products at Wal-Mart from May of 2004 to November of 2004 as compared to the same period in 2003*. CI 3 had personal knowledge of these sales declines based on reports obtained directly from Butler, the Company's chief sales officer. *CI 3 attributed this decline in sales to the souring relationship between Prestige and Wal-Mart* as well as to the fact that Prestige began selling Wal-Mart a private label household powder cleaner due to a preexisting contract between Bonita Bay and Wal-Mart. CI 3 stated that the private label product was in direct competition with *Comet*.

49.     *Confidential Informant 4* ("CI 4") – CI 4 is former Sales Director employed by Prestige from February of 2003 until April 6, 2004, CI 4 had more than 19 years experience in the sale of food and pharmaceutical products to consumer retails outlets. At Prestige, CI 4 was the Director of Sales for the Southern Region of the United States and covered the area from Philadelphia to Miami. CI 4 reported to VP of Sales Sam Blankenship. As a sales director CI 4 sold all of Prestige's Household segment products, including *Comet* products. CI 4 also sold certain of the Company's OTC products including *Murine* and *Clear Eyes*. CI 4 sold to some of Prestige's largest customers, including Wal-Mart and Publix, a grocery store chain with more than 700 stores.

50.     CI 4 stated certain of the Company's *Comet* brand products were in material decline during calendar 2003 and the first quarter of calendar 2004. In particular, CI 4 stated that *Comet* Clean and Flush toilet products had suffered from limited distribution, were over-priced and did not perform well compared to competitors' products. For example, in September 2003 Publix's head of purchasing had cancelled initial orders for the product after evaluating product samples. CI 4 added that by no later than February of 2004, Wal-Mart had stopped carrying the Clean and Flush product in its stores. In addition to the *Comet* Clean and Flush product, CI 4 stated that sales were slow on other *Comet* items such as Toilet Tabs and the Orange Oxy Powered *Comet* Cleaner.

- 19 -

51.     CI 4 stated that defendant Mann's explanation that Prestige's first quarter sales had declined due in part to a failed promotion of *Compound W Freezer-Off* products lacked credibility. CI 4 explained that the *Compound W* brand is referred to in the sales industry as a "need driven product." By this CI 4 meant that it is a product that consumers purchase only when they need the item. According to CI 4, most people would not purchase a wart remover simply because it was on sale and if a person needed to purchase a wart remover, the person would go to the store and purchase it regardless of whether or not the item was on sale, and would not be inclined to purchase more than one if it was on sale. For these reasons, CI 4 doubted that Wal-Mart would have ordered significant quantities of *Compound W* to begin with.

52.     Another reason that CI 4 discounted Prestige's explanation for its decline in fiscal first quarter 2006 sales was because Wal-Mart had a policy called "just in time" ordering that limited the ordering of stock on items to levels at which the item had sold in the past. CI 4 had personal knowledge that Wal-Mart put this policy in place because Wal-Mart did not want its stores or warehouses to be overstocked. CI 4 stated that the buyers at Wal-Mart were constantly "bombarded" by sales people wanting Wal-Mart to run a promotion on their products. CI 4 added that Wal-Mart buyers routinely rejected these promotions. CI 4 expressed disbelief that Wal-Mart would have invested so much money to promote a "need" item such as a wart remover, as opposed to a consumable item that was replenished often, or even a product like *Comet*, which consumers use regularly and keep in their cabinets all the time.

53.     The Prospectus contained numerous statements which were materially false and misleading because they failed to disclose and misrepresented the adverse facts detailed herein concerning *Compound W* and *Comet*.

54.    In the section entitled, "Selected Financial Data," the Prospectus represented that the Company's "pro forma" "net sales" for the nine months ended December 31, 2004 had increased by more than $9.6 million or 4.4% compared to the same period in the prior year led by "strong sales growth" of *Compound W*.   The Prospectus also described certain sales, marketing and product development activities with respect to the Company's *Compound W* and *Comet* brands, which purportedly accounted for more than 42% of sales during the nine months ended December 31, 2004. The Prospectus stated in pertinent part:

Net Sales . . . .   On a pro forma basis, net sales increased by $9.6 million, or 4.4%, from $215.4 million for the nine months ended December 31, 2003 to $225.0 million for the nine months ended December 31, 2004.

***On a pro forma basis, the increase in overall net sales was driven by the Over-the-Counter Drug Category which had net sales of $121.9 million for the nine months ended December 31, 2004 compared to net sales of $108.4 million in the prior year. The Compound W (+$11.5 million) and Clear Eyes (+$6.4 million) brands exhibited strong sales growth for the nine months ended December 31, 2004.***

*            *            *

***Compound W is the number one wart removal brand in the United States with a 34.3% market share and an ACV of 88%.***

Since *Compound W*'s acquisition, we have successfully expanded the wart remover category and enhanced the value associated with the *Compound W* brand by introducing several new products. On July 1, 2003, we introduced a cryogenic wart removal product, *Compound W Freeze Off*, which allows consumers to use a wart freezing treatment similar to that used by doctors.   ***Compound W Freeze Off has achieved high trade acceptance and achieved $25.9 million in sales for the twelve months ended December 31, 2004.***

*            *            *

Comet competes in the abrasive and non-abrasive tub/tile cleaner sub-category of the household cleaning category . . . .   ***Comet is the number two brand in this sub-category with 29.4% market share*** . . .

***Since Comet's acquisition [in October 2001], [Prestige] has expanded the brand's distribution, increased advertising and promotion and implemented focused marketing initiatives***.   Further, under Bonita Bay ownership, Comet has seen multiple new product introductions to extend the brand into new categories and

- 21 -

increase usage . . . .  These and other new products are aimed at extending Comet's brand value by promoting Comet as a comprehensive cleaning system . . . . [Emphasis added.]

55.     The statements referenced above in ¶54 were each materially inaccurate for the reasons stated in ¶34 above.  In addition, the Prospectus negligently misrepresented or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)     that Prestige was then experiencing a steep decline in demand for, and sales of, certain *Compound W* products, that was offset, in whole or in part, by granting material concessions to some of the Company's largest customers, including Wal-Mart.  According to former Prestige employees, CI 1 and CI 2, a "large supply" of the Company's *Compound W* products valued at more than $4 million was shipped to Wal-Mart in December 2004 subject to an agreement that Prestige would grant "chargebacks" and/or "returns" to Wal-Mart for any excess *Compound W* inventory after March 31, 2005, the Company's fiscal year-end.  'But for' these sales/chargeback agreements, the declining demand for *Compound W* would have been apparent in the Company's financial statements as lower sales results.  By choosing to comment on *Compound W's* "strong sales growth," its "number one" market position, and specific sales results, which included the December 2004 sales/chargeback transaction(s), Defendants had a duty to disclose this chargeback-type arrangement, its effects on the Company's financial results and its divergence from GAAP and/or the Company's normal sales practices; and

(b)     that Prestige was then experiencing a material decline in demand for, and sales of, certain *Comet* brand products, including abrasive cleaners and toilet products, among others.  Indeed, months after the IPO was completed the Company's 2005 Form 10-K (filed in June 2005) disclosed for the first time that in November 2004 – four months prior to the IPO – Prestige discontinued its *Comet* Clean and Flush product – which resulted in a material decline in the

Company's fiscal 2005 sales compared to prior years.  In addition, CI 3, a former Vice President of Sales Development with responsibility for sales of *Comet* products to all of Prestige's customers, including Wal-Mart, stated that based on point-of-sale reports obtained from Butler, sales of *Comet* abrasives to Wal-Mart had declined by 10% in the period May to November 2004 resulting in millions of dollars of lost revenues compared to the prior year.  By choosing to comment on *Comet*'s "number two" market position and the "expanded . . . distribution" of *Comet* products, Defendants had a duty to disclose that a major *Comet* product such as Clean and Flush had been discontinued and that *Comet* sales to the Company's largest customer were materially declining during at least seven of the first nine months of fiscal year 2005.

56.     The Prospectus described the Company's "competitive strengths" stating in pertinent part as follows:

> *Diversified Portfolio of Recognized and Established Brands*.  We own and market well−recognized brands with long histories in the marketplace. On average, each of our ten major brands were established over 60 years ago and are widely recognized by consumers. Our diverse portfolio of products provides us multiple sources of growth and minimizes our reliance on any one single category.  ***We provide significant marketing support to our brands in order to grow our sales and our long−term profitability***.

*     *     *

> *Proven Ability to Develop and Introduce New Products*. We focus our marketing and product development efforts on identifying underserved consumer needs and then designing products that directly address those needs . . . . ***In addition, some of our product introductions may not be successful, such as Comet Clean and Flush™, which we introduced in August 2003***.  [Emphasis added.]

57.     The Prospectus included representations concerning the Company's "growth strategy" stating in pertinent part as follows:

> *Increasing Distribution Across Multiple Channels*.  Our broad distribution ensures that our products are well positioned across all available channels and that we are able to participate in changing consumer retail trends.  Recently, we have expanded our sales in dollar and club stores, introducing customized packaging and sizes of our products for these higher growth channels.  For example, ***Comet and Spic and Span***

*have grown approximately 11% and 189%, respectively, in these channels during the calendar year ended December 31, 2003*. There is a risk that we may not able to maintain or enhance our relationships across distribution channels, which could adversely impact our sales and profitability.  [Emphasis added.]

58.    The statements referenced above in ¶¶56-57 were each materially inaccurate for the reasons stated in ¶¶34, 55 above.  In addition, Defendants had no reasonable basis for stating that Prestige was then providing "significant marketing support to grow sales of [its] brands" when, in fact, sales of the Company's major brands, including *Compound W* and *Comet*, were declining throughout fiscal 2005, and were continuing to decline due to Defendants' withdrawal of key marketing support in the form of promotions and "buy-downs" as detailed in the statements of CI 3 and CI 4 in ¶¶47-52.

59.    The Prospectus described the "market position" of the Company's products stating in pertinent part as follows:

Approximately 67% of our pro forma gross sales from the fiscal year ended March 31, 2004 are from brands with a number one or number two market position, which include *Chloraseptic*, *Clear eyes*, *Comet*, *Compound W*, *Cutex* and *New−Skin*.

The foregoing information with respect to our market share is provided by the independent market research firm Information Resources, Inc. Information Resources data reports retail sales in the food, drug and mass merchandise markets. Information Resources data for the mass merchandise market, however, does not include Wal−Mart, which ceased providing sales data to Information Resources in 2001. *Although Wal−Mart represents a significant portion of the mass merchandise market for us, as well as our competitors, we believe that Wal−Mart's exclusion from Information Resources data does not significantly change our market share or ranking relative to our competitors*. Unless otherwise indicated, all references in this prospectus to "market share" or "market position" are based on sales in the United States, as calculated by Information Resources for the 52 weeks ended August 8, 2004.  [Emphasis added.]

60.    The statements referenced above in ¶59 were each materially inaccurate for the reasons stated in ¶¶34, 55, above.  In addition, Defendants had no reasonable basis for stating that the exclusion of Wal-Mart point-of-sale (or sell-through) results for both *Compound W* and *Comet* was not material to Prestige's market position.  Prestige had access to both Wal-Mart's VMI

inventory system and weekly (or often daily) point-of-sale data showing growing and slow-moving

inventories as a result of declining sales.

61.     The Prospectus described the Company's "strong customer relationships" with some

of its largest customers, including Wal-Mart, Walgreens and Target, among others, stating in

pertinent part as follows:

> Our senior management team and dedicated sales force maintain long-standing relationships with our top 50 customers, accounting for approximately 81% of our combined gross sales on a pro forma basis, excluding the Vetco acquisition, for the year ended March 31, 2004.  ***Our sales force consists of 10 people and is also complemented by third-party sales management organizations who focus on key client relationships by interfacing directly with the remaining accounts and report directly to members of management***.

> *            *            *

> ***Our principal customer relationships include Wal-Mart, Walgreens, Target, CVS and Kroger. For the year ended March 31, 2004, on a pro forma basis, excluding the Vetco acquisition, our top five and ten customers accounted for approximately 38.6% and 49.7% of our gross sales***.  No single customer other than Wal-Mart accounted for more than 10% of our gross sales in the most recent fiscal year and none of our other top five customers accounted for less than 3.0% of our gross sales for the most recent fiscal year. Our top fifteen customers each purchase products from virtually every major product line.

> ***Our strong customer relationships provide us with a number of important benefits including minimizing slotting fees and shortening payment time after invoicing. In addition, these relationships help us by facilitating new product introductions and ensuring prominent shelf space***.  Management's emphasis on strong personal and professional relationships, speed and flexibility, leading sales technology capabilities, including electronic data interchange, e-mail, the internet, integrated retail coverage, consistent marketing support programs and ongoing product innovation we believe will continue to maximize our competitiveness in the increasingly complex retail environment.  [Emphasis added.]

62.     The statements referenced above in ¶61 were each materially inaccurate for the

reasons stated in ¶¶34, 55, above.  In addition, the Prospectus negligently misrepresented or omitted

the following adverse facts which then existed and disclosure of which was necessary to make the

statements made not false and/or misleading, including:

(a)     that Prestige's relationship with Wal-Mart was deteriorating due to the Company's abusive order and re-stocking procedures which resulted in the shipment of Prestige products to numerous Wal-Mart stores and warehouses that were never going to sell.  In addition, the Company had eliminated many marketing and promotional programs which further eroded the Company's relationship with Wal-Mart; and

(b)     that the Company could only maintain its relationship with Wal-Mart through the use of material sales concessions including  agreements to accept returns and/ or grant "chargebacks" for excess and unsold inventories.

### Post-Offering Materially False and Misleading Statements

63.     On or about April 11, 2005, defendants Mann and Anderson made financial presentations at the SunTrust Robinson Humphrey 34th Annual Institutional Investor Conference in Atlanta.  Based on the presentation materials available on Prestige's website, Mann and Anderson represented that the Company had achieved "[o]rganic revenue growth of approximately 7% annually [through the end of calendar 2004] since 2001" resulting in "[o]rganic double digit EPS growth" and "additional growth from acquisitions."  Mann and Anderson further represented that Prestige had achieved "[s]trong [t]op [l]ine [g]rowth" based on a compound annual growth rate of 43% in gross revenues during the period 2001 to 2004, including "pro-forma gross revenues of $232 million and $294 million in fiscal years 2003 and 2004, respectively.

64.     Following these presentations, the price of Prestige common stock appreciated more than 7% over the next six trading sessions closing at $18.02 per share on April 18, 2005 compared to $16.75 on April 8, 2005.

65.     The statements referenced above in ¶63 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them including:

(a)     that the Company's "top-line" revenues were materially overstated due to Prestige's GAAP violations, as alleged in ¶¶96-125, *infra*.  Prestige has admitted that its financial statements for the fiscal years ended March 31, 2003, 2004, 2005 and the three months ended June 30, 2005 were materially false and misleading when issued and have restated those financial statements to bring them in compliance with GAAP;

(b)     that Prestige had improperly recognized *Compound W* sales revenues of at least $4 million during December 2004.  The Company sold the products to Wal-Mart subject to return and/or chargeback concessions. Specifically, two former employees of the Company with personal knowledge of the transaction, CI 1 and CI 2, stated that the concessions allowed Prestige to keep "excess inventories" at Wal-Mart through the Company's fiscal year-end March 31, 2005. Wal-Mart subsequently returned more than $2 million worth of *Compound W* products after March 31, 2005.  The Company improperly accounted for the product returns as part of a "revenue shortfall" reported to investors in July 2005. Defendants have never revealed the full truth concerning these transactions and instead attributed the losses related to the product returns to a failed product promotion; and

(c)     based on the foregoing, it was not true that Prestige had achieved "strong top-line revenue growth" or that the Company's "organic" revenue growth was "7%" for the years 2001 through 2004.

66.     On or about May 9, 2005, Prestige issued a press release announcing its financial results for the fourth quarter and fiscal year ended March 31, 2005.  The Company reported net sales for the quarter were $78.4 million, up 22.4% over the prior year's pro forma results for the same period. According to the press release, operating income for the quarter was $30.1 million, up $18.8 million or 165.3% over the prior year's Q4 pro-forma operating income of $11.3 million.

Furthermore, Prestige also reconfirmed targeted annual revenue growth of 5-7% and earnings growth of 12-16% over the next 3-4 years. The press release stated that this "model is identical to what was presented as a part of the recent IPO process." Defendant Mann commented on the Company's seemingly positive results, stating, in pertinent part, as follows:

> The successful Prestige Brands IPO capped a very strong fiscal year that has brought great change, opportunity and success to our company. ***We continued our excellent sales growth and outstanding profit gains in the fourth quarter***. Our core brands have met or exceeded expectations, and our recent acquisition of Little Remedies is now fully integrated and is performing exceptionally well. Finally, we introduced several promising products in the quarter, including Clear Eyes for Dry Eyes and five new Little Remedies items. Looking ahead, we have a number of new brand extension initiatives underway. We are continuing our rapid international expansion, and we believe we are well positioned to deliver solid growth in the new fiscal year. [Emphasis added.]

67.    On or about May 10, 2005, Prestige hosted a conference call for analysts and investors to discuss the Company's fiscal 2005 financial results. The call was attended by defendants Mann and Anderson among others. According to a transcript of the call published by *Fair Disclosure Wire* ("FD"), defendants Mann and Anderson confirmed the Company's triple-digit growth and product segment results, stating in pertinent part as follows:

*Mann:*

> Turning to Compound W, Compound W continues to be one of our strongest businesses and it also performed well in the quarter. As [defendant Anderson] said it was essentially flat versus a year ago. ***That is in part that -- that flatness is in part, driven by the timing of some Wal-Mart promotional orders which – which occurred at the very end of December. If you look at the [C]ompound W or the Freeze Off volume over the last six months, you see very strong year on year gains***. We are continuing to expand distribution for *Freeze off* particularly in food outlets where there is still great room for growth. And while obviously we can't replicate the extraordinary growth rates for *Freeze off* that took place in the past year there is still a major opportunity for us to convert wart sufferers who right now are treating their warts in a doctor's office, convert them to OTC use.

*    *    *

> ***As I said before we watch our sales through Wal-Mart point-of-sale data weekly and often daily. And it's really amazing, the minute we put TV advertising on***

- 28 -

*behind Compound double -- W Freeze off the rate of sale in Wal-Mart for that item, which is already very good, jumps quite noticeably. In fact, in a more general way, more advertising support is a fundamental part of our plan for fiscal '06 and beyond.*

<u>Anderson</u>:

Net sales for the quarter were $78.4 million. That was up 22% over the prior year pro forma results for the same quarter. ***Operating income for the quarter was $30.1 million. That was up very nice 18.8 million, or 165% over last years Q4 pro forma operating income of 11.3 million. The improvement in operating income was largely due to the strong sales results***.

\*       \*       \*

The Company's sales growth for the quarter was driven by the largest segment, the OTC segment, which had a 37% increase over the prior year['s] pro forma revenues. For the quarter revenues for the household cleaning segment also grew up 13% over the prior pro forma while the household – excuse me, while the personal care segment declined by 7%. In the quarter ended March 31 within the OTC segment our Clear Eyes, Chloraseptic, and Little Remedies brands recorded good year-over-year growth. ***Compound W which had been seeing explosive growth over the past few quarters*** actually was flat for the quarter. The OTC segment had best sales in total of $45 million compared to pro forma net sales of 33.2 million in the prior year's quarter. Within household cleaning the Comet brand showed solid growth for the quarter while Spic&Span posted a small decline. In total the segment had net sales of $24.9 million compared to pro forma net sales of $22 million for the prior year period.

\*       \*       \*

Adjusted EBITDA for the fiscal year of 2005 of 109.3 million was 22.9 million, or 27% greater than pro forma adjusted EBITDA of 86.4 million for the fiscal year ended March 31, 2004. ***On a segment basis for the full year all four major brands in the OTC category; Chloraseptic, Clear Eyes, Compound W, and Little Remedies posted solid gains versus the prior year***. Both of the household cleaning brands, Comet and Spic&Span posted gains as well, while personal care had declines which were primarily related to Denorex and Prell. [Emphasis added.]

68.     During the 'Q&A' portion of the call defendant Mann confirmed that the Company

had "good momentum going in to the new year" and reiterated previously issued guidance of 5% to

7% revenue growth. The FD transcript stated in pertinent part as follows:

[Analyst]: [I]t seems like on a 5% to 7% top line growth this year, with all the new products and the pricing it seems somewhat conservative. I mean how should we view that looking at this year's numbers?

[Defendant Mann]: Well, our -- our guidance is that over a long -- longer term type time frame 5% to 7% top line growth is -- is what we see and ***we do have good momentum going into the -- into the new year***. And I would ask you to draw your own conclusions from that.  [Emphasis added.]

69.     The statements referenced above in ¶¶66-68 were each materially false and misleading for the reasons stated in ¶65.  In addition, the statements in ¶¶66-68 failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them including:

(a)     that Prestige's financial statements violated GAAP and the Company's own accounting policies.  *See* ¶¶96-125, *infra*.  The Company has now admitted that its financial statements were materially false and misleading when issued and has restated its financial results for the fiscal years ended March 31, 2003, 2004, 2005 and the interim period of fiscal 2006 ended June 30, 2005.  Defendants have admitted that the Company's revenues for the fourth quarter of fiscal 2005 ended March 31, 2005 were actually $77.313 million and not $78.361 million as originally reported and that the Company's actually incurred a net loss of $1.717 million and not a net loss of $0.224 million as originally reported;

(b)     that Prestige's reported sales of *Compound W* were materially overstated by at least $4 million during December 2004 due to the recognition of revenue on sales to Wal-Mart subject to material concessions, including the Company's agreement to accept returns and/or chargebacks for all excess inventories of *Compound W* after its fiscal year ended March 31, 2005;

(c)     that defendant Mann's comments in press releases and during conference calls with analysts failed to disclose that Prestige had granted material sales concessions to Wal-Mart during December 2004.  Therefore, defendant Mann's statement that Prestige "continued [its]

excellent sales growth and outstanding profit gains in the fourth quarter [2005]" and defendant

Anderson's comments that "*Compound W . . .* had been seeing explosive growth over the past few

quarters" were each materially false and misleading when issued;

          (d)     that based on the review of "Wal-Mart point-of-sale data weekly and often

daily," the Individual Defendants knew or recklessly disregarded that sales of *Compound W* had

continued to materially decline during the quarter ended March 31, 2005, and that Prestige would be

obligated to accept the return of all excess inventory from Wal-Mart amounting to millions of dollars

of charges and losses; and

          (e)     based on the foregoing, Defendants had no reasonable basis for stating that

Prestige was expecting "targeted annual revenue growth of 5-7% and earnings growth of 12-16%

over the next 3-4 years."

       70.     On or about June 8, 2005, defendants Mann and Anderson made presentations to the

Piper Jaffray Consumer Conference, during the conference Mann made representations concerning

the Company's consistent revenue growth and robust product segment results.  A transcript of

defendant Mann and Anderson's conference presentations published by FD stated in pertinent part as

follows:

> When you look at our financial performance, Pete Anderson will take you through
> this in more depth, you'll see *we have consistently, year after year after year after*
> *year, grown our revenues, our topline revenues, a little better than 7%. That is all*
> *organic growth.* That is not factoring in the additive benefit of acquisitions. You will
> see that we have EBITDA margins in excess of 35%. I think it is the strongest
> EBITDA percentage in our industry. And as I said, almost all of that translates into
> free cash flow.
>
>              *      *      *
>
> Here is a snapshot of our just recently completed fiscal year. We are on March 31
> fiscal year. This is the first year of our operation as a blended, merged Company
> bringing together all the pieces that make up the Company today. And you can see
> *we have a little over $300 million of net revenues, and about $109 million of*
> *EBITDA. And you can see topline sales grew just under -- or 8.5%.* Adjusted

EBITDA taking up the onetime costs related to the mergers, grew 26.5%. So strong topline growth and excellent, excellent bottom line growth. The bottom line growth is a combination of improved margins and synergies resulting from savings as we put together the various pieces of the Company. [Emphasis added.]

71.    The statements referenced above in ¶70 were each materially false and misleading for the reasons stated in ¶¶65, 69, above.  In addition, the statements in ¶70 failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them including:

(a)    that the Company had now admitted that its historical financial statements violated GAAP and the Company's own accounting policies, and therefore defendants Mann and Anderson's statements concerning the Company's consistent "organic sales growth" of a "little better than 7%" was materially false and misleading when issued;

(b)    Prestige was granting material sales concession to its major customers, including Wal-Mart, as detailed herein, making it appear that the Company's sales were increasing when in fact they were not; and

(c)    based on the foregoing Mann and Anderson had no reasonable basis for stating that Prestige has the "strongest" profit margins in the industry.

72.    On or about June 28, 2005, Prestige filed with the SEC an amended Form 10-K for the year ended March 31, 2005.[1]  The 2005 Form 10-K/A, signed by each of the Individual Defendants, confirmed Prestige's previously announced financial results and represented that the Company's reported increase of 8.6% in pro forma net sales "was led by *Compound W*, which

---

[1] The amended Form 10-K was filed to correct material omissions which violated certain of the Company's then existing debt covenants.  On June 15, 2005 the Company filed its original 2005 Form 10-K which excluded certain subsidiary financial statements necessary to comply with the Company's debt covenants.

benefited from very strong Freeze off sales. . . .”  The Form 10K/A stated in pertinent part as

follows:

> On a pro forma basis, net sales increased by $23.9 million or 8.6% from $279.4
> million for fiscal 2004 to $303.3 million for fiscal 2005. . . . the increase in overall
> net sales was driven by the Over−the−Counter Drug segment which had net sales of
> $167.2 million for fiscal 2005, compared to pro forma net sales of $141.5 million in
> fiscal 2004. ***The strong sales performance compared to fiscal 2004 was led by
> Compound W, which benefited from very strong Freeze off sales . . . .*** [Emphasis
> added.]

73.    In addition, the 2005 Form 10-K/A, included representations concerning the

Company's “growth strategy,” the “market position” of its products and Prestige's “strong customer

relationships, among other things, stating in pertinent part as follows:

> Our growth strategy is to focus on our marketing, sales, customer service and product
> development efforts in order to continue to enhance our brands and drive growth. . . .
> We will continue to invest in advertising and promotion to drive the growth of our
> brands. . . .  ***While the absolute level of marketing expenditure differs by brand and
> category, we typically have increased the amount of investment in our brands after
> acquiring them.***
>
> *        *        *
>
> Approximately 71% of our net sales from the fiscal 2005 are from brands with a
> number one or number two market position, which include Chloraseptic, Clear Eyes,
> Comet, Compound W, Cutex and New−Skin.
>
> *        *        *
>
> Compound W is the number two wart removal brand in the United States with a
> 33.7% market share and an ACV of 88%. Since Compound W's acquisition, we have
> successfully expanded the wart remover category and enhanced the value associated
> with the Compound W brand by introducing several new products. On July 1, 2003,
> we introduced a cryogenic wart removal product, ***Compound W Freeze off, which
> allows consumers to use a wart freezing treatment similar to that used by doctors.
> Compound W Freeze off has achieved high trade acceptance.***
>
> *        *        *
>
> The data included in this Form 10−K/A regarding market share and ranking,
> including our position and the position of our competitors within these markets are
> based on data generated by the independent market research firm Information
> Resources, Inc., which we refer to as “Information Resources.” Information

- 33 -

Resources reports retail sales in the food, drug and mass merchandise markets. *Information Resources data for the mass merchandise market, however, does not include Wal−Mart, which ceased providing sales data to Information Resources in 2001. Although Wal−Mart represents a significant portion of the mass merchandise market for us, as well as our competitors, we believe that Wal−Mart's exclusion from Information Resources data does not significantly change our market share or ranking relative to our competitors.*

*    *    *

Our principal customer relationships include Wal−Mart, Walgreens, CVS, Target and Dollar General. For fiscal 2005, our top five and ten customers accounted for approximately 43% and 55% of our gross sales, respectively. No single customer other than Wal−Mart accounted for more than 10% of our gross sales in the most recent fiscal year and none of our other top five customers accounted for less than 3.0% of our gross sales for the most recent fiscal year. Our top fifteen customers each purchase products from virtually all of our major product lines.

*Our strong customer relationships provide us with a number of important benefits including minimizing slotting fees and shortening payment time after invoicing. In addition, these relationships help us by facilitating new product introductions and ensuring prominent shelf space.* We believe that management's emphasis on strong customer relationships, speed and flexibility, leading sales technology capabilities, including electronic data interchange, e−mail, the Internet, integrated retail coverage, consistent marketing support programs and ongoing product innovation will continue to maximize our competitiveness in the increasingly complex retail environment. [Emphasis added.]

74.    The statements referenced above in ¶72-73 were each materially false and misleading for the reasons stated in ¶¶65, 69, above.  In addition, the statements in ¶¶72-73 failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them including:

(a)    that Prestige's relationship with Wal-Mart was strained due to the Company's abusive order and re-stocking procedures which resulted in the shipment of Prestige products to numerous Wal-Mart stores and warehouses that were never going to sell.  In addition, the Company had eliminated many marketing and promotional programs which further eroded the Company's relationship with Wal-Mart; and

- 34 -

(b)      that the Company could only maintain its relationship with Wal-Mart through the use of material sales concessions including agreements to accept returns and/ or grant "chargebacks" for excess and unsold inventories.

75.      The 2005 Form 10-K/A also represented that the Company's financial statements had been prepared in accordance with GAAP, stating in pertinent part as follows:

> ***The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America*** requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Although these estimates are based on the Company's knowledge of current events and actions the Company may undertake in the future, actual results could differ from those estimates.

> *      *      *

> Revenue Recognition. ***For sales transactions, we comply with the provisions Securities and Exchange Commission of Staff Accounting Bulletin 104 "Revenue Recognition,"*** which states that revenue should be recognized when the following revenue recognition criteria are met: (1) persuasive evidence of an arrangement exists; (2) ***the product has been shipped and the customer takes ownership and assumes the risk of loss;*** (3) the selling price is fixed or determinable; and (4) collection of the resulting receivable is reasonably assured. These criteria are satisfied upon shipment of product and revenues are recognized accordingly.

> *      *      *

> Reserve for returns, allowance for doubtful accounts and the allowance for obsolete and damaged inventory. We must make estimates of potential future product returns related to current period sales. In order to do this, we analyze historical returns, current economic trends and changes in customer demand and acceptance of our products when evaluating the adequacy of our reserve for returns in any accounting period. If actual future returns are greater than estimated by management, our financial statements in future periods would be adversely affected.  [Emphasis added.]

76.      The statements referenced above in ¶75 were each materially false and misleading because Prestige's financial statements were not prepared in accordance with GAAP and Prestige did not follow its stated revenue recognition policies, as detailed in ¶¶96-125.

77.     On or about June 29, 2005, *The Wall Street Journal* published a highly positive article, entitled, "Prestige Brands Finds Growth By Turning Around Old Cast Offs."  In the article, defendant Mann again confirmed the Company's "average 7% internal sales growth rate" and reiterated guidance that "the [C]ompany will continue to do so."  The article stated in pertinent part as follows:

> Although the company Mr. Mann runs, Prestige Brands Holdings Inc., may not be well-known, the products the company sells hold significant clout within their niches. ***Its Compound W wart remover, Chloraseptic sore throat remedies, Denorex medicated shampoo, and Cutex nail polish remover are all leaders in their categories.***
>
> Many of the brands were cast off by larger companies such as Procter & Gamble Co. and GlaxoSmithKline PLC. Now, as part of Prestige, the products receive more sales and marketing support and new products are in the pipeline. With the extra attention, Prestige has forged a business with attractive profit margins and faster-than-average sales growth.
>
> Before going public in February, Prestige was owned by private-equity firm GTCR Golder Rauner LLC. Prestige's $450 million initial public offering tripled the investment made by GTCR.
>
> *        *        *
>
> By going public, Prestige Brands was able to reduce its "fairly significant" debt level, said Mr. Mann, chairman and chief executive. The Irvington, N.Y., company now has less than $500 million in long-term debt, and ***its debt rating was upgraded by Moody's Investors Services last month.***  The public listing also gives Prestige access to the public-equity market should future acquisition opportunities arise, Mr. Mann said.  ***Without the benefit of acquisitions, Prestige has average 7% internal sales growth, he said. "I expect the company will continue to do so," he said.*** [Emphasis added.]

78.     Defendants' false and misleading statements in press releases, at investor conferences and in news articles had their intended effect as the price of Prestige common shares closed above $20 per share for the first time on or about July 5, 2005, and reached a Class Period trading high of $21.15 per share on or about July 11, 2005.

79.     The statements referenced above in ¶77 were each materially false and misleading for the reasons stated in ¶¶65, 69, above.  In addition, Defendant Mann had no reasonable basis for stating that Prestige "has average 7% internal sales growth" because the Company's financial statements violated GAAP and failed to present the true financial performance of the Company.

## The Truth Begins To Be Revealed

80.     On or about July 27, 2005, after the market close, Prestige announced its financial results for the quarter ended June 30, 2005.  For the quarter, the Company reported that net sales were $63.5 million, 6% below net sales of $67.7 million for the same quarter of last year. The Company reported declining revenues in each of its three business segments: OTC medicines, Household Cleaning products and Personal Care products.  For Prestige's largest product segment – OTC medicines – net sales declined 5% to $32.9 million from $34.6 million last year.  Prestige reported that the OTC revenue decline was primarily demand driven reflecting "significant category declines" for *Compound W* wart remover and *New-Skin* liquid bandage.  The press release stated in pertinent part as follows:

> The Company experienced sales declines in each of its three business segments: Over−the−Counter medicines ("OTC"), Household Cleaning products and Personal Care products. For the OTC segment, net sales of $32.9 million were 5% less than last year's first quarter reported net sales of $34.6 million. ***The result for the segment is attributable to year−on−year declines for Compound W® wart remover and New−Skin® liquid bandage, which reflected significant category declines.*** These were partially offset by gains on *Chloraseptic®* sore throat treatment and Little Remedies®, the line of children's OTC products acquired in October 2004. [Emphasis added.]

Defendant Mann also commented on Prestige's declining financial results and future outlook, stating in pertinent part as follows:

> The Company has previously announced that it will not provide short-term specific guidance on sales and earnings. However, management is aware, that as a newly public company, it needs to keep shareholders informed of anticipated future results. As we do every quarter, we have reviewed and re-forecasted every brand. ***As a result of the first quarter revenue shortfall and continuing issues on certain brands***

- 37 -

*which will carry over into the second quarter, we believe that revenue and earnings growth in the current year will fall below our original expectations. We now anticipate revenues and profits to be essentially flat or down slightly in the current fiscal year.*

Our underlying assumption in our long term business model is that revenues for the established brands in our portfolio will grow over time. At the same time, due to our efficiencies and de-leveraging, earnings growth should exceed revenue growth. Looking ahead, we continue to believe these assumptions are sound. Acquisitions, including the Chore Boy(R) transaction, are incremental to this outlook.  [Emphasis added.]

81.    In response to this announcement the price of Prestige common stock declined to a low of $10.10 during trading on July 28, 2005, before closing for the day at $11.90 per share, a 40% one-day decline, on extremely heavy volume of more than 14 million shares.  The July 28, 2005 closing price represented a 25% decline from the $16.00 per share offering price just five months before.

82.    On or about July 28, 2005, Prestige hosted a conference call with investors and analysts to discuss the Company's second quarter June 30, 2005 financial results.  During the call defendants Mann and Anderson admitted that in addition to demand-driven "category declines" the Company's poor second quarter financial performance was the result of  certain "onetime abnormalities" that adversely affected sales of the Company's largest product segment – OTC – and the Company's leading selling product – *Compound W*.  A transcript of the call published by FD, reported defendant Mann's comments in pertinent part as follows:

[DEFENDANT] MANN:[H]ere's one of the two one-time abnormalities that affected the quarter, *during the December and March quarter, one of our key - in fact, our key mass merchandiser customer - placed a significant order for a significant amount of Compound W Freeze off in preparation for an early season major promotion.* That promotion ran in February and March, and due to the cold and rainy spring, which caused the wart category to slow and begin later, *the promotion occurred during that pre-season period and frankly had disappointing results.*

*It left this customer at the end of the quarter with a significant amount of inventory, and as a result, that inventory sharply reduced their purchases of Freeze*

- 38 -

*off during the June quarter.* The good news is that *Freeze off* continues to move through that customer's retail shelves, and most of that inventory, or much of that inventory, has now been depleted through the strong seasonal upswing, but ***there is still some excess inventory that's going to limit sales during the September quarter. That's Compound W.*** [Emphasis added.]

83.    During the Q & A with analysts, Defendants were pointedly questioned by several

analysts concerning their lack of candor prior to the July 27th press release regarding known adverse

trends in the sales of *Compound W* and *Comet* products.  The FD transcript stated in pertinent part as

follows:

BILL CHAPPELL, ANALYST, SUNTRUST ROBINSON HUMPHREY: Good morning, Pete and Peter. ***I guess we're kind of confused as when you kind of saw that things were turning south.*** You've been on the road a fair amount over the last quarter, and in particular it seems like trying to understand what the controls of the business, even going back to last quarter, you had said in early May that the quarter was off to a strong [start]. So help us understand what controls you have and kind of what gives you confidence going forward in your new guidance.

[DEFENDANT] MANN: Bill, to sort of retrace the steps of the quarter, our April sales were somewhat below our internal budget, and we attributed that to a very strong month of March. And then when the month of May came in precisely on our internal budget, we believed that we were tracking well towards our internal budget. The month of June turned out to be a soft month and was driven by all the factors that we just talked about, and it was ultimately the month of June, more than any other single thing, that contributed to the revenue weakness during the quarter.

BILL CHAPPELL: ***But going back to your commentary on Compound W, did you not have a sense from your large customer that the sell through didn't go well and that there would be excess inventory in the channel?***

[DEFENDANT] MANN: ***We knew going into April that there was going to be inventory overhang from that customer,*** and that inventory overhang was factored into our projections. ***Our internal budgets for Compound W during the quarter was to be down.***

*        *        *

AMY CHASEN, ANALYST, GOLDMAN SACHS: I'm just wondering, in listening to a lot of your commentary, I guess ***what is so surprising to me is how broad based the weakness was, and I'm just wondering whether you guys got a little bit aggressive in terms of selling into the trade in the earlier part of this year, and maybe even as far back as last year, and now we're just seeing that adjustment.*** Can you comment on that?

[DEFENDANT] MANN: *I think there is a little bit of that, not that it was a deliberate phenomenon, Amy, but that the March quarter was a very strong quarter for us, and our factory volumes slightly outpaced our consumer revenues during that quarter,* and now in this quarter, as I think I went through brand through brand, our factory revenues were somewhat softer than our consumer consumption trend.

AMY CHASEN: It sounds like they were significantly softer and that there's still a fair amount of inventory that has to be de-stocked at the trade level. Is that a fair comment?

[DEFENDANT] MANN: *Only in the case of Freeze off.*

[DEFENDANT] ANDERSON: I think, Amy, *one of the things that in hindsight now we saw with Comet, for instance, we deliberately kept the pricing freeze on Comet Powder for March 15th with the expectation that any loading that there would be would work its way through the end of the quarter. And I think we saw in the month of April that indeed some retailers look like they definitely bought in a little bit more going in, but I think that that is definitely behind us,* because retailers don't keep that much.

AMY CHASEN: Okay, it just seems like in other categories that you mentioned, there was a similar issue.

\*     \*     \*

MARK MILLER, ANALYST, WILLIAM BLAIR: Hi, good morning, Peter. You talked about a lot of external factors, market conditions, timing, to what extent and where do you think you had execution missteps?

[DEFENDANT] MANN: *I think that the one execution misstep that we had, which was something that we tried to correct - the retailer that bought so much Freeze off, we tried to talk them into buying less in order to be cautious about that to avoid the inventory overhang, and they didn't want to do that.* I don't know that we could have been any more forceful in our resistance to that, but as I look back on it, I wish we had tried even harder than we did.

MARK MILLER: That's really the only area, though, where you see internal changes versus kind of what you should have done internally?

PETER MANN: Yes, really. As I look back, I don't see that we screwed up anywhere, that we did something that was unwise, that *the things that have affected the quarter, with the exception of that Freeze off inventory issue, were not stuff that we did badly, it was stuff that was external to us.*

84.     The statements in ¶¶80, 82-83 only partially revealed the truth about Prestige, its

business and financial statements.  Defendants continued to conceal that, since the IPO, Prestige had

issued materially false and misleading financial statements which overstated Prestige's financial performance.

85.     On or about July 29, 2005, an article published by Reuters summarized several analysts and investor comments concerning the Company's disappointing financial results.  The article stated in pertinent part as follows:

> [S]hareholders of Prestige Brands Holdings Inc., which went public just five months ago, were hard hit this week when the stock fell more than 40 percent in a single day after Prestige reported earnings that were roughly half what Wall Street had expected.
>
> "What people are upset about is the 'gotcha' earnings report because it seems like they were asleep at the switch and they are heading for a train wreck," said Francis Gaskins, president of IPOdesktop.com.
>
> *        *        *
>
> Repeated efforts to reach the Prestige Brands and its representatives were unsuccessful.
>
> For months leading up to Wednesday's earnings bomb, company executives had been touting its bright prospect to investors -- first in presentations to prospective investors ahead of its initial public offering in February, and more recently at a series of Wall Street brokerage conferences.
>
> Management failed to take the opportunity to signal the problems the company was encountering at recent industry conferences, said Jason Schrotberger, an analyst at Turner Investment Partners, which has owned the stock.
>
> Schrotberger, who met management during the IPO roadshow, was impressed at the time Prestige went public but has not been endeared by its actions." Based on how bad the quarter was, it would have been in their best interests to have flagged this a lot earlier in a public format rather than waiting all the way to earnings after giving some bullish commentary along the way," Schrotberger said.
>
> *        *        *
>
> John Richardson, a senior portfolio manager at Munder Capital Management, said his firm bought Prestige Brands at its IPO and recently sold the stock because of its low return on capital. "We made decent money on it. We sold it just because it didn't stack up well. We didn't have any idea they would miss to the extent they did. That was a total surprise for the market," Richardson said. Munder, which held 220,000 shares of Prestige as of May 31, was also concerned about what it was hearing about

the company from competitors and suppliers, Richardson said, declining to discuss specifics.

"A lot of times the best research you get is when you actually talk to suppliers and competitors," he said. "Normally we get confirmation on something, we weren't getting confirmation on things we like."

86.     As news of Defendants' corrective disclosures in the conference call and Reuters news article made their way into the market, the price of Prestige shares declined an additional 5% to close at $11.25 per share on July 29, 2005.

87.     On or about August 9, 2005, Prestige filed with the SEC Form 10-Q for the quarter ended June 30, 2005.  The Form 10-Q, signed by defendant Anderson, confirmed the Company's previously announced financial results.  The Form 10-Q also represented that Prestige's financial statements were prepared in accordance with GAAP, stating in pertinent part as follows:

> The unaudited consolidated financial statements presented herein have been prepared in accordance with generally accepted accounting principles for interim financial reporting and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.  In the opinion of management, the financial statements include all adjustments, consisting only of normal recurring adjustments that are considered necessary for a fair presentation of the Company's financial position, results of operations and cash flows for the interim periods.

> *       *       *

> Revenues are recognized when the following revenue recognition criteria are met: (1) persuasive evidence of an arrangement exists; (2) there is a fixed or determinable price; (3) the product has been shipped and the customer takes ownership and assumes risk of loss; and (4) collectibility of the resulting receivable is reasonably assured.  These criteria are satisfied upon shipment of product, and revenues are recognized accordingly.  Provision is made for estimated customer discounts and returns at the time of sale based on the Company's historical experience.

> *       *       *

> The Company must make estimates of potential future product returns related to current period sales. In order to do this, the Company analyzes historical returns, current economic trends, changes in customer demand and acceptance of the Company's products when evaluating the adequacy of the Company's allowance for

- 42 -

returns in any accounting period.  If actual returns are greater than those estimated by management, the Company's financial statements in future periods may be adversely affected.

88.    On or about November 1, 2005, Prestige issued a press release announcing that it had completed the acquisition of Chore Boy, a household cleaning-pad business.  The Company also announced that it would report its fiscal 2006 second quarter sales and earnings on Monday, November 14, 2005 at 7:00 am and host a conference call for analysts at 8:30 am.

89.    On or about, Sunday, November 13, 2005, Prestige announced that its second quarter earnings announcement would be delayed until Tuesday November 15, 2005 at 7:00 am. No reason was provided for the delay.

90.    Then, on November 15, 2005, contemporaneously with its second quarter earnings release, Prestige announced that it was restating its historical financial statements for the fiscal years ended March 31, 2003, 2004, 2005 and the first quarter of fiscal 2006.  The press release stated in pertinent part as follows:

> Prestige Brands Holdings, Inc. (NYSE: PBH), a consumer products company with a diversified portfolio of well-recognized brand names, today announced results for the second fiscal quarter ended September 30, 2005, and provided its outlook for the balance of the fiscal year.
>
> The Company also announced that management and the Audit Committee of the Company's Board of Directors recently completed an internal review of certain accounting practices at the Company. As a result of that review, the Company concluded that certain prior period financial statements could no longer be relied upon and has reclassified certain cooperative advertising expenses, changed the time at which it recognizes revenue and restated the reported number of common shares outstanding used in the computation of earnings per share. As a result of the conclusion with respect to prior financial statements, the company will restate certain of its historical results. All references in this release to prior periods results are to the restated results.
>
> Restatement of Prior Period Financial Statements
>
> As a result of a review of certain accounting practices performed in conjunction with the Company's assessment of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002, the Company determined it may have

erroneously applied generally accepted accounting principles as they relate to the recognition of revenue, the classification of certain trade promotion allowances, and the computation of earnings per share. At the direction of the Audit Committee of the Company's Board of Directors, an independent review of these issues was performed.

Management and the Audit Committee concluded that, in light of the accounting errors discussed above, the financial statements for the years ended March 31, 2005, 2004 and 2003 and the quarterly data for the years ended March 31, 2005 and 2004 included in the Company's Annual Report on Forms 10-K and 10-K/A for the year ended March 31, 2005 and the financial statements for the quarters ended June 30, 2005 and 2004 included in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005 should no longer be relied upon. The Company will file an amended Form 10-Q/A for the quarter ended June 30, 2005 and an amended Form 10-K/A for the year ended March 31, 2005 as soon as practicable. Because of the review and restatement described above, the Company was unable to file its Quarterly Report on Form 10-Q by November 14, 2005, its due date. The Company will file a Notice on Form 12b-25 with respect to that report today and expects to file the report on or before the extended due date of November 21, 2005.  [Emphasis added.]

91.     During a conference call with analysts later that same day, defendants Mann and

Anderson attempted to minimize the import of the restatement, a transcript of the call published by

FD, stated in pertinent part as follows:

Of course the main focus of today's call is our financial results, but before we get into those financial results, I would like to make a few brief comments on the accounting changes which we have implemented with this quarter's results. Later on, Pete Anderson will provide considerable detail on that topic. But first as an overview, *as a part of our internal ongoing process of becoming Sarbanes-Oxley compliant at the end of the current fiscal year, we have reviewed many -- most of our accounting policies, procedures and controls. As a result of that internal review, in late October management notified the audit committee of the Board of Directors of possible issues concerning certain of our accounting policies.* And based upon that, the audit committee began a review. Their review consisted of an examination of the Company's revenue recognition policies, and the Company's accounting policies with respect to classification, and certain cooperative advertising expenses, and finally, our calculation of outstanding shares.

As a result of that review, we have made policy modifications and have restated historical results in order to provide proper comparability with last year's figures. The three areas we changed, first, revenue recognition. Prestige, like many of the important companies in our industry, has traditionally recognized revenues when a domestic shipment was made to domestic customers. We have now changed that policy to recognize revenues when our customers actually receive those shipments.

As explained in detail in today's press release, we believe this approach to revenue recognition better conforms to SEC published guidelines. ***This change has the practical impact of moving a few days of revenue from one month into the next. As our business is relatively stable month-to-month, as you will see, the net gain or net loss for any individual quarter is generally small.***

\*       \*       \*

As we think about this, of course, any restatement is a serious matter, but from my perspective these accounting changes do not alter the overall shape, the size or the trajectory of the Company. ***Our historic shipments in invoices are unchanged. We have only adjusted the timing of when we actually recognize those shipments and invoices.*** Our promotional activities and our promotional spending by our retailer customers also hasn't changed one bit. We have simply changed the line in the income statement where some of those expenses are captured.

And most important, except for the effects of shifting the timing of revenues caused by the change in revenue recognition, our operating income, our net income, and our cash flow delivery hasn't changed one bit. We're simply making slightly more or slightly less in a given quarter, depending on how the timing of month end shipments impact that particular quarter.

92.    Following these disclosures the price of the Prestige common stock declined an additional 15%, falling from $11.43 per share on November 11, 2005 to $9.72 per share on November 16, 2005.

93.    The market for Prestige's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Prestige's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Prestige securities relying upon the integrity of the market price of Prestige's securities and market information relating to Prestige, and have been damaged thereby.

94.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Prestige's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that

- 45 -

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

95.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Prestige's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Prestige and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### Prestige's Materially False and Misleading Financial Reporting and Violations of GAAP

96.     At all relevant times during the Class Period, Prestige represented that the financial results disclosed to investors were prepared in accordance with GAAP and the accounting and disclosure rules and regulations of the SEC.[2]

97.     Such representations were materially false and misleading when made because, as it has now admitted, Prestige's financial statements were prepared in a manner that violated numerous provisions of GAAP.  By failing to file financial statements with the SEC which conformed to

---

[2] Pursuant to Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

GAAP, Defendants repeatedly disseminated financial statements of Prestige that were presumptively misleading and/or inaccurate.

**Prestige's Admission That Its
Financial Statements Were Materially Misstated**

98.      The Class Period commences with the issuance of the Prospectus.  The Prospectus included the Company's financial statements for the nine months ended December 31, 2004, and the years ended March 31, 2004, 2003 and 2002.  Prestige's financial statements for the periods ended March 31, 2005 and June 30, 2005 were also issued during the Class Period.

99.      On November 15, 2005, the price of Prestige's stock dropped when it announced that the financial statements it issued during the Class Period were materially false and misleading and "should no longer be relied upon."  In fact, on that date, ***Prestige disclosed that the Company's*** ***cumulative*** *net income from its* ***inception*** *through June 30, 2005 had been overstated by more than* ***21%***.

100.     Specifically, in its November 15, 2005 press release, Prestige disclosed:

As a result of a review of certain accounting practices performed in conjunction with the Company's assessment of internal controls over financial reporting under Section 404 of the Sarbanes−Oxley Act of 2002, ***the Company determined it may have erroneously applied generally accepted accounting principles as they relate to the recognition of revenue, the classification of certain trade promotion allowances, and the computation of earnings per share.*** At the direction of the Audit Committee of the Company's Board of Directors, an independent review of these issues was performed.

Management and the Audit Committee concluded that, ***in light of the accounting errors discussed above, the financial statements for the years ended March 31, 2005, 2004 and 2003 and the quarterly data for the years ended March 31, 2005 and 2004 included in the Company's Annual Report on Forms 10−K and 10−K/A for the year ended March 31, 2005 and the financial statements for the quarters ended June 30, 2005 and 2004 included in the Company's Quarterly Report on Form 10−Q for the quarter ended June 30, 2005 should no longer be relied upon.*** The Company will file an amended Form 10−Q/A for the quarter ended June 30, 2005 and an amended Form 10−K/A for the year ended March 31, 2005 as soon as practicable.

- 47 -

Because of the review and restatement described above, the Company was unable to file its Quarterly Report on Form 10−Q by November 14, 2005, its due date. The Company will file a Notice on Form 12b−25 with respect to that report today and expects to file the report on or before the extended due date of November 21, 2005.

With respect to revenue recognition, Staff Accounting Bulletin No. 104 sets forth the criteria for revenue recognition, one of which is that risk of loss has passed to the customer. The Company, consistent with its published pricing and shipping terms, has historically recognized revenue upon shipment of product to the customer. Upon closer examination of its shipping practices and terms, the Company determined that it often was unclear when, from a legal standpoint, risk of loss of its products passed to its customers. Accordingly, the Company has concluded that revenue should not be recognized until product is received by its customers (referred to as "FOB destination point"), unless the risk of loss transfers to the customer at the point of shipment. ***The Company will restate its previously issued financial statements to reflect its conclusions with respect to how revenue should be recognized.*** Peter C. Mann, Chairman and Chief Executive Officer said, "Although a restatement is a serous matter, this is not a case of revenues that did not exist; the practical effect of this change is to move the last few days of sales from the end of a quarter to the beginning of the next quarter. It is an issue only of timing; however, it is important to us as a company that we do record our revenues at the appropriate time." The effects of these adjustments for each fiscal period are reflected in Exhibit A, attached to this news release.

With respect to the classification of trade promotions and allowances, Emerging Issues Task Force Issue 01−09 sets forth the criteria for classifying such promotions and allowances as an expense or a reduction of revenue. Upon review, ***the Company determined that it had incorrectly classified certain promotion and allowance amounts as expense rather than as a reduction of revenue. The Company will restate its previously issued financial statements for the periods referred to above to correct these misclassifications.*** These adjustments do not affect net income, operating income or cash flows from operations. The effects of these adjustments are reflected in Exhibit A, attached to this news release.

With respect to earnings per share, Statement of Financial Accounting Standards No. 128 sets forth the criteria for computing basic and diluted earnings per share. Upon examination of its earnings per share calculations, ***the Company determined that certain issued and outstanding, but unvested, shares held by management were improperly reflected in the basic earnings per share computations.*** The effects of this revision are reflected in Exhibit A, attached to this news release. [Emphasis added]

101.    Defendant Mann's representation concerning Prestige's revenue recognition

restatement was, in and of itself, materially false and misleading and demonstrates his proclivity to

deceive investors. Indeed, *if* Prestige's improper accounting for its revenue recognition was truly "to

move the last few days of sales from the end of a quarter to the beginning of the next quarter" and "an issue only of timing," Prestige would not have restated its financial statements for the quarter ended June 30, 2005 by *decreasing* its accounts receivable by approximately *$6.1 million* while *increasing* its revenue recognition by *$1.9 million*.  Moreover, and contrary to defendant Mann's attempt to minimize defendants' improper revenue recognition practices, the SEC is strongly opposed to premature revenue recognition practices.  In fact, approximately *two-thirds* of the SEC's enforcement actions associated with improper revenue recognition relate to "timing issues," evidencing the Commission's concern about the impropriety of such practices.

102.    Concerning its method of revenue recognition, Prestige's annual 2005, 2004, 2003 and 2002 financial statements disclosed:[3]

> Revenues are recognized when the following revenue recognition criteria are met: (1) persuasive evidence of an arrangement exists; (2) there is a fixed or determinable price; (3) delivery has occurred; and (4) collectibility is reasonably assured.  These criteria are satisfied (and revenue is recognized) upon shipment of product. Provision is made for estimated customer discounts and returns at the time of sale.

103.    Prestige has now admitted that the criteria for revenue recognition were not satisfied upon the shipment of product to its customers and that the revenue recognition policy it disclosed to investors during the Class Period violated GAAP.[4]

104.    In order to secure an inflated price for Prestige's IPO stock offering, Defendants overstated the Company's reported revenue, thereby creating the false impression about the demand

---

[3] Prestige's annual 2004, 2003 and 2002 financial statements were included in its IPO prospectus. While Prestige has not restated its Fiscal 2002 Financial Statements, Plaintiffs incorporate by reference all allegations concerning its improper financial reporting insofar as they relate to that fiscal year.

[4] GAAP provides that information about the accounting policies adopted by a reporting company is *"essential"* for financial statements users.  (Accounting Principles Board ("APB") Opinion No. 22, ¶8).

for the Company's products.    Indeed, GAAP, in Financial Accounting Standards Board's ("FASB's") Emerging Issues Task Force ("EITF") Abstract No. 99-19, notes:

> How companies report revenue for goods and services they offer has become an increasingly important issue because some investors may value certain companies on a multiple of revenues rather than a multiple of gross profit or earnings.

105.    Prestige has now also admitted that it improperly classified certain sales promotions as a general and administrative expense rather than as a reduction of revenue.[5]  Such improper accounting yielded two artificial benefits: (1) an overstatement of Prestige's revenue; and (2) an overstatement of Prestige's gross profits.

106.    Indeed, Prestige's improperly overstated gross margins distinguished it from other companies in its peer group and otherwise artificially inflated the Company's IPO stock offering.[6] For example, a March 21, 2005 JP Morgan research report described the Company's margins as a "Key Investment Point" noting:

**High Margins Are Driven by Attractive Categories and Outsourcing**

Despite its small scale, Prestige has high margins given: (1) Prestige's high OTC drug exposure:  The OTC drugs category has robust margins given solid pricing and limited competition. ***Prestige's fiscal 2005E gross margins of 56% and operating margins of 33% are well-above the 47% and 12% respective averages for Prestige's small-to-mid cap consumer peer group.*** (2) Limited competition:  Prestige competes mostly in niche categories which are too small to be a focus for larger companies and have low private label share. (3) Outsourcing model: Prestige outsources manufacturing, allowing it to benefit from third party economies of scale and minimize capex.  [Second emphasis added.]

---

[5] As noted below, GAAP provides that cash sales incentives such as discounts, coupons, and rebates as well as arrangements labeled as slotting fees, cooperative advertising, and buydowns are presumed to be a reduction of the selling price of a vendor's product and, therefore, should be characterized as a reduction of revenue in the vendor's income statement.

[6] Gross profit as a percentage of sales is generally referred to as gross margin.

107.    Prestige has now admitted that its reported gross profit in the IPO prospectus, that is, its gross profit for the nine months ended December 31, 2004 and its gross profit for the years ended March 31, 2004 and 2003, were overstated by approximately **9.0%, 5.2%, 9.5%,** respectively.[7]

**Prestige's Financial Misstatements**
**During the Class Period Were Material**

108.    As a result of its improper accounting practices, Prestige has restated its financial statements from 2003 through the first six months of 2006.  In so doing, Prestige has made the determination that such financial statements were materially misstated because GAAP, in APB Opinion No. 20, provides that **only materially misstated financial statements need be retroactively restated.**

109.    In fact, **Prestige has now admitted that its net income** for the nine months ended December 31, 2004, and the year ended March 31, 2003, as reported in its IPO prospectus **were overstated** by approximately **15%** and **19%**, respectively.  After its February 2005 IPO, Prestige issued financial statements for the quarter ended March 31, 2005.  The Company has also admitted that its originally **reported loss** during such quarter **was understated** by approximately 61%.

110.    Indeed, Defendants knew, or recklessly ignored, that the financial results Prestige issued during the Class Period were materially false and misleading.  For example, former Company managers, including a former senior executive, CI 1, stated that prior to Prestige's IPO, Wal-Mart placed a $4 million order of *Compound W* Freeze Off in December 2004.  The former employees stated that this order was suspect in that: (1) the order was for approximately 19-20 weeks worth of the product when Wal-Mart normally ordered 4-6 weeks worth of the product at any one time; (2)

---

[7] In addition, Prestige's gross profit for the three and twelve months ended March 31, 2005 were overstated by approximately **5.3%**, **7.9%** respectively.

the order was made in advance of a Wal-Mart promotion of *Compound W* Freeze Off in the first

quarter of 2005 when wart-causing viruses that the product treats tend to manifest themselves during

the warm weather; and (3) consumers tend to purchase such product on an "as needed" basis and are

not incentivized to purchase that product simply because it is on sale.

111.    In truth and in fact, the above order, which was known to, or recklessly ignored by,

Defendants because it was orchestrated by Butler, Prestige's chief sales officer, was nothing more

than a consignment arrangement because, according to former Company employees CI 1 and CI 2,

Prestige agreed to accept return of Wal-Mart's December 2004 order of *Compound W* Freeze Off if

it did not sell.

112.    Since all of the risks of ownership of order did not pass to Wal-Mart upon shipment

of order, GAAP, specifically the SEC's Staff Accounting Bulletin ("SAB") Nos. 101 and 104, did

not permit Prestige to recognize revenue from such transactions at the time of shipment.

Nevertheless, in violation of GAAP, Prestige improperly reported approximately $4 million on this

transaction upon shipment in December 2004.

113.    In fact, former Company managers stated that Wal-Mart agreed not to return the

excessive *Compound W* Freeze Off order that Prestige shipped in December 2004 ***until after***

Prestige's March 31, 2005 year end.

114.    Thereafter, Wal-Mart returned up to 50% of the order during the quarter ended June

30, 2005.  Indeed, this product return adversely affected the Company's sales and financial results

during the quarter ended June 30, 2005.

115.    In fact, a former Company national accounts manager, CI 2, stated that prior to, and

during the Class Period, ***Prestige sales directors were "constantly" instructed to inflate customer***

***orders***, thereby overstocking customer warehouses with Prestige product.  In addition, a former

Senior VP of Operations stated that although Medtech and Prestige Brands International had a "no

return policy," both of these entities accepted customer returns "all the time."

116.    Among other things, the above practices precluded Prestige from reasonably

estimating product returns made in the ordinary course of its business.  GAAP prohibits the

recognition of revenue when product returns can not be reliably estimated.  SAB Nos. 101 and 104

and FASB's Statement of Financial Accounting Standards ("SFAS") No. 48.

117.    Prestige's improper policy of recognizing revenue upon the shipment of product

afforded it with the means to inflate its operating results when it shipped excess product to its

customers.  In so doing, Prestige manufactured the financial results it reported in its IPO prospectus

and Forms 10-K and 10-Q during the Class Period.

118.    As noted in the SEC's Staff Accounting Bulletin No. 99:

> For the reasons noted above, the staff believes that *a registrant* and the auditors of its financial statements *should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.*  While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling *where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.*  The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings.  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.  [Footnotes deleted.]  [Emphasis added.]

**Prestige's Violations of GAAP**

119.    As Section 13 of the Securities Exchange Act of 1934 provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.      transactions are executed in accordance with management's general or specific authorization;

ii.      transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.      access to assets is permitted only in accordance with management's general or specific authorization; and

iv.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

120.      GAAP, as set forth in FASB Statements of Concepts ("Concepts Statement") No. 1 provides that one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance.

121.      Prestige has now admitted that it violated the above provision of GAAP by presenting its financial statements during the Class Period in a manner which materially distorted its true operating performance. In addition, Prestige has admitted that it issued financial statements during the Class Period which also violated at least the following provisions of GAAP:

(a)    the principle that revenue can not be recognized until the customer has taken title to, and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.  (SAB Nos. 101 and 104; FASB Concept Statement Nos. 2 and 5; SFAS No. 48; Accounting Research Bulletin No. 43; APB Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2)[8];

(b)    The principle that cash consideration (including sales incentives) given by a vendor to a customer is presumed to be a reduction of revenue.  This presumption is overcome if: (i) the vendor receives, or will receive, a separate, identifiable benefit in exchange for the cash consideration it has given; and (ii) the vendor can reasonably estimate the fair value of the benefit received.  (EITF Abstract No. 01−09);

(c)    The principle that basic earnings per share be calculated by dividing income available to common stockholders by the weighted average number of common shares outstanding (SFAS No. 128);

(d)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, 34);

(e)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, 40);

---

[8] In 2003, SAB No. 101 was superceded by SAB No. 104, which updated portions of SAB No. 101 and incorporated certain sections of the SEC's Staff's interpretation of Revenue Recognition in Financial Statements "Frequently Asked Questions and Answers" into SAB No. 101.

(f)      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, 50);

(g)      The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (Concepts Statement No. 1, 42);

(h)      The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, 58-59);

(i)      The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, 79); and

(j)      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, 95, 97).

122.    In failing to file financial statements with the SEC which conformed to the requirements of GAAP, Prestige disseminated financial statements that were presumptively

misleading and inaccurate.  The Company's IPO prospectus and Forms 10-K and 10-Q filed with the

SEC during the Class Period were also materially false and misleading in that they failed to disclose

known trends, demands, commitments, events, and uncertainties that were reasonably likely to have

a material adverse effect on the Company's liquidity, net sales, revenues and income from

continuing operations, as required by Item 303 of Regulation S-K.

**Prestige's False and Misleading Reporting
and Certifications of Disclosure and Internal Controls**

123.     As a result of the rash of recent corporate accounting scandals, Congress enacted the

Sarbanes-Oxley Act ("SOX") in 2002, in part, to heighten the responsibility of public company

directors and senior managers associated with the quality of financial reporting and disclosures made

by their companies.  The SEC revised Item 307 and added Item 308 of Regulation S-K [17 C.F.R.

§§229.307 and 308] to require companies to disclose a report by management on its internal control

over its financial reporting and the conclusions of its principal executive and principal financial

officer on the effectiveness of the Company's disclosure controls and procedures.[9]  As a result,

Prestige Form 10-K for the year ended March 31, 2005 disclosed:

Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our
principal executive officer and our principal financial officer, ***we conducted an
evaluation of our disclosure controls and procedures,*** as such term is defined under
Rule 13a−15(e) and 15d−15(e) under the Securities Exchange Act of 1934.  ***Based
on this evaluation, our principal executive officer and our principal financial***

_____

[9] The Securities Exchange Act Rules and Regulations defines disclosure controls: (1) as controls and
other procedures designed to ensure that the information required to be disclosed to investors under
The Securities Exchange Act is recorded, processed, summarized and reported; and (2) internal
control over financial reporting as a process designed by, or under the supervision of, the issuer's
principal executive and principal financial officers to provide reasonable assurance regarding the
reliability of financial reporting and the preparation of financial statements for external purposes in
accordance with GAAP.

*officer concluded that the Company maintained effective disclosure controls and procedures as of the end of the period covered by this report.*

Changes in Internal Controls

During the year ended March 31, 2005, there was no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. [Emphasis added.]

124.    These representations, which were materially false and misleading for the reasons alleged herein, were then wrongfully certified by defendants Mann and Anderson and included as part of Prestige's filings with the SEC:[10]

I . . ., certify that:

1.      I have reviewed this Annual Report on Form 10−K of Prestige Brands Holdings, Inc.;

2.      Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.      Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;

4.      *The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a−15(e) and 15(d)−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15(d)−15(f)) for the registrant *and have*:

        (a) *designed such disclosure controls and procedures*, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant,* including its consolidated

---

[10] Prestige made representations concerning its internal and disclosure controls which defendants Mann and Anderson certified in the Company's Form 10-Q for the quarter ended June 30, 2005, that were similar in all material respects to the representations and certifications in the Company's March 31, 2005 Form 10-K.

subsidiaries, *is made known to us* by others within those entities, particularly during the period in which this report is being prepared;

(b) *designed such internal control over financial reporting,* or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee* of the registrant's board of directors (or persons performing the equivalent functions):

(a) *all significant deficiencies and material weaknesses* in the design or operation of *internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.  [Emphasis added.]

125.    After the end of the Class Period, Prestige disclosed:

As of the end of the period covered by this report, September 30, 2005, an evaluation as carried out by our management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  The Company's disclosure controls and procedures are designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely discussions regarding required disclosure.  Based

on this evaluation, *the Company's Chief Executive Officer and Chief Financial Officer have concluded that* because *certain deficiencies in the Company's internal control over financial reporting* that are described below and in Note 2 to the consolidated condensed financial statements contained in Part I, Item 1 of this Quarterly Report on Form 10-Q, Item 4.02(a) of the Company's Current Report on Form 8-K filed with the Commission on November 15, 2005 (the "Restatement 8-K") and the Company's Notification of Late Filing on Form 12b-25 with respect to this Quarterly Report on Form 10-Q (the "12b-25 Notice") filed with the Commission on November 15, 2005 *constituted material weaknesses that existed at September 30, 2005, and* because the Company was unable to file its Quarterly Report on Form 10-Q within the time period specified in the Commission's rules, *the Company's disclosure controls and procedures were not effective as of September 30, 2005.* The Company's management nevertheless has concluded that the consolidated financial statements included in this report present fairly, in all material respects, the Company's financial position, and results of operation and cash flows for the periods presented in conformity with accounting principles generally accepted in the United States of America.

Internal Control Over Financial Reporting

Management, with the oversight of the Audit Committee of the Company's Board of Directors, recently conducted an internal review of the Company's books and records. As a result of the findings of that review (including with respect to effects of the above referenced control deficiencies), as noted above, the Company will restate its audited consolidated financial statements for the years ended March 31, 2005, 2004 and 2003 and the quarterly data for the years ended March 31, 2005 and 2004 included in the Company's Annual Report on Forms 10-K and 10-K/A for the year ended March 31, 2005, and the financial statements for the quarters ended June 30, 2005 and 2004 included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2005. *According to PCAOB* Accounting Standard No. 2, An Audit Of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements, *a restatement of previously-issued financial statements is at least a significant deficiency and a strong indicator that a material weakness exists with respect to internal control over financial reporting. As noted above, management concluded that the control deficiencies listed below constituted material weaknesses as of September 30, 2005.* Material weaknesses are control deficiencies, or a combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The control deficiencies that the Company identified were as follows:

   a) *The Company did not maintain effective controls over the completeness and accuracy of revenue in accordance with the requirements of SAB No. 104. Specifically, the Company's controls failed to ensure that risk of loss had passed to the customer before revenue was recognized.*

b) *The Company did not maintain effective controls over the classification of promotions and allowances in accordance with the requirements of EITF 01-09. Specifically, the Company's controls failed to prevent or detect the incorrect classification of promotions and allowances as an operating expense instead of as a reduction of revenue.*

c) *The Company did not maintain effective controls over the completeness and accuracy of deferred income tax balances. Specifically, the Company's controls failed to ensure that adjustments to deferred income taxes for increases in graduated federal income tax rates were timely recognized in the Company's financial statements.*

d) *The Company did not maintain effective controls over the accuracy of the computation of earnings per share. Specifically, the Company's controls failed to ensure that unvested restricted shares of common stock were properly considered in the computation of earnings per share.*

Management, with the oversight of the Audit Committee of the Board of Directors, is devoting and intends to continue to devote considerable effort to making improvements in the Company's internal control over financial reporting. These improvements have included appointing a new Corporate Controller in June 2005 who reports to the Company's Chief Financial Officer. Additionally, in July 2005, the Company engaged an independent tax consultant to provide guidance with regard to the determination of corporate tax obligations. This consultant reports directly to the Corporate Controller. Specifically related to the control deficiencies referenced above and described in the Restatement 8-K and the 12b-25 Notice that constituted material weaknesses, the Company's remediation plan includes the following:

The Company is enhancing its guidelines and implementing controls in connection with the issuance of trade promotional allowances. Additionally, the Company will provide training to employees on the proper accounting and documentation policies related to trade promotional allowances and implement new policies to ensure compliance throughout the year.

The Company is taking measures to enhance the controls over the selection, application and monitoring of its accounting policies to ensure consistent application of accounting policies that are generally accepted in the United States of America. The Company is also integrating reporting lines, increasing communication and supervision across operating and accounting organizations, and increasing the review of existing accounting policies. Specifically as it relates to the accounting for revenue recognition, the Company is changing its controls and accounting policies surrounding the review, analysis and recording of shipments and shipping terms with customers, including the selection and monitoring of appropriate assumptions and guidelines to be applied during the review and analysis of all customer terms. Specifically, the Company is implementing controls over the accounting, monitoring, and analysis of all customer shipping terms and conditions to ensure transactions are recorded consistent with generally accepted accounting principles.

With respect to the computation of earnings per share, the Company will provide training to employees on the proper accounting related to the proper treatment of unvested shares in the basic and diluted computations.

The above-described remedial efforts all began following the completion of the Company's quarter ended September 30, 2005.  There were no changes in the Company's internal control over financial reporting during the quarter ended September 30, 2005 that materially affected or are reasonably likely to materially affect internal control over financial reporting.

Management is not required to report on the assessment of its internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 until it files its Annual Report on Form 10-K for the fiscal year ended March 31, 2006. Although it expects its internal control over financial reporting to be effective at that time, if it fails to remediate any condition constituting a material  weakness on or before March 31, 2006, the presence of a material  weakness at that time would cause management to conclude that its internal controls over financial reporting are ineffective and would cause its external auditors to issue an adverse opinion on the effectiveness of such internal controls.  [Emphasis added.]

### Additional Scienter Allegations

126.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Prestige, their control over, and/or receipt and/or modification of Prestige's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Prestige, participated in the fraudulent scheme alleged herein.

127.    While Prestige insiders were issuing false and misleading statements about Prestige and its business, the Company completed its IPO of approximately 28 million shares realizing over $515 million in net proceeds. In addition certain insiders including defendants Anderson, GTCR

(*i.e.,* Donnini and Hemmer) sold millions of their personally held Prestige shares in the IPO at artificially inflated prices, as shown in the following chart:

| Name | Date | Shares | Price | Proceeds | % Sold |
|------|------|--------|-------|----------|--------|
| Anderson | 2/10/2005 | 123,758 | $16.00 | $1,980,128 | 26.16% |
| GTCR | 2/10/2005 | 7,737,109 | $16.00 | $123,793,744 | 34.06% |
| Mann | 2/10/2005 | 304,145 | $16.00 | $4,866,320 | 27.14% |
| **TOTAL** | | | | **$130,640,192** | |

## Applicability of Presumption of Reliance:
## Fraud on the Market Doctrine

128.   At all relevant times, the market for Prestige's securities was an efficient market for the following reasons, among others:

(a)   Prestige's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   as a regulated issuer, Prestige filed periodic public reports with the SEC and the NYSE;

(c)   Prestige regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Prestige was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

129.    As a result of the foregoing, the market for Prestige's securities promptly digested current information regarding Prestige from all publicly available sources and reflected such information in Prestige's stock price. Under these circumstances, all purchasers of Prestige's securities during the Class Period suffered similar injury through their purchase of Prestige's securities at artificially inflated prices and a presumption of reliance applies.

**Transaction and Loss Causation**

130.    The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

131.    As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Prestige's business, prospects and operations.

132.    The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Prestige and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated during the Class Period.  Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices.

133.    Defendants' fraudulent conduct caused the damages complained of herein when the price of Prestige common stock subsequently declined 40% following Defendants' July 27, 2005 announcement that net sales were 6% below net sales for the same quarter of last year.

134.    Although the 40% decline in the stock price on July 28, 2005 was the result of the Defendants' selective disclosure that Prestige revenues had actually declined, such partial disclosure served to reveal to investors that Prestige's previously concealed true financial condition was not as

had been previously represented.  In fact, Defendants admitted that Prestige's declining revenues related to a failed *Compound W* promotion and product category declines in *Compound W* and other products.

135.    As a result of these revelations, and the corresponding drop in the price of Prestige's stock, investors suffered real economic loss.

136.    Further, the timing and magnitude of Prestige's stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, microeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Prestige's stock price and the subsequent significant decline in the value of Prestige's stock when the true state of the Company's operations and finances were revealed to the market and investors.

137.    Then, just five months later, Prestige conceded in a November 15, 2005 press release, not only that it continued to experience declining financial results, but also that it's financial reporting deficiencies would force the company to restate the results reported for previous periods. The announcements caused the price of Prestige common shares to fall an additional 15%, closing at $9.72 per share on November 15, 2005 draining additional inflation from the price of Prestige common stock.

## No Safe Harbor

138.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially

- 65 -

from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Prestige who knew that those statements were false when made.

139.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT I**

**Violations of Section 11 of the Securities Act
Against all Defendants**

140.    Plaintiffs TAPP, Talahhassee and Charter purchased Prestige common stock in the IPO, as defined herein, as set forth in the certification previously submitted in this litigation, which is incorporated by reference herein.  As a result of Defendants' false statements in the Registration Statement for the February 9, 2005 IPO, Plaintiffs, immediately above purchased Prestige common stock at artificially inflated prices.  The price of Prestige stock declined significantly when the truth began to be publicly revealed about the Company's adverse business and financial condition that had been negligently overstated by Defendants, and accordingly Plaintiffs were damaged as a proximate result.

141.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  Plaintiffs only incorporate, repeat and reallege the allegations contained in ¶¶1-62, 80-92, above.  This Count does not contain any allegations sounding

- 66 -

in fraud.  Moreover, for purposes of this Count only, Plaintiffs affirmatively state that they do not

claim that Defendants committed intentional or reckless misconduct or that Defendants acted with

scienter or fraudulent intent.

142.    The Registration Statement for the IPO was inaccurate and misleading, contained

untrue statements of material facts, omitted to state other facts necessary to make the statements

made not misleading, and concealed and failed adequately to disclose material facts as described

above.

143.    Prestige is the registrant for the IPO.  The Defendants named herein were responsible

for the contents and dissemination of the Registration Statement and the Prospectus.

144.    As issuer of the shares, Prestige is strictly liable to Plaintiffs and the Class for the

misstatements and omissions.

145.    The Individual Defendants each signed the Registration Statement either personally

or through an Attorney-in-Fact and/or caused its issuance.  The Individual Defendants each had a

duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the

statements contained in the Registration Statement.  They had a duty to ensure that such statements

were true and accurate and that there were no omissions of material facts that would make the

statements made misleading.  These Defendants failed to do so.  None of the Individual Defendants

made a reasonable investigation or possessed reasonable grounds for the belief that the statements

contained in the Registration Statement and the Prospectus were true and without omissions of any

material facts and were not misleading.

146.    The Underwriter Defendants were each underwriters, as that term is used in Section

11(a)(5) of the Securities Act, with respect to the IPO and the Company's securities sold through the

Registration Statement.  The Underwriter Defendants were required to investigate with due diligence

the representations contained therein to confirm that they did not contain materially misleading statements or omit to state material facts.  None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not misleading.

147.    Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

148.    Plaintiffs acquired Prestige common stock traceable to and in reliance on, the Registration Statement.

149.    Plaintiffs and the Class have sustained damages.  The price of Prestige common stock has declined substantially subsequent to and due to Defendants' violations as described herein.

150.    At the times they purchased Prestige common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 27, 2005 or November 15, 2005.  Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs filed this Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

151.    Plaintiffs repeat and reallege only the allegations contained in ¶¶1-62, 80-92, above.

152.    This Count is brought by Plaintiffs pursuant to §12(a)(2) of the Securities Act, 15

U.S.C. §77l, on behalf of all purchasers of Prestige shares in connection with, and traceable to, the

IPO.  This Count does not contain any allegations sounding in fraud.  Moreover, for purposes of this

Count, Plaintiffs affirmatively state that they do not claim that Defendants committed intentional or

reckless misconduct or that Defendants acted with scienter or fraudulent intent.

153.    Defendants were sellers and offerors and/or solicitors of purchasers of the common

stock offered pursuant to the Prospectus.  Defendants issued, caused to be issued, and/or signed the

Registration Statement in connection with the IPO.   The Registration Statement contained a

Prospectus, which was used to induce investors, such as the Plaintiffs and the other members of the

Class, to purchase Prestige common stock.

154.    The Prospectus contained untrue statements of material facts, omitted to state other

facts necessary to make the statements made not misleading, and concealed and failed to disclose

material facts.  The Individual Defendants' actions of solicitation included participating in the

preparation of the false and misleading Prospectus.  Prestige and the Underwriter Defendants, acting

through their employees, agents and others, solicited such purchases for their personal financial gain

through the preparation and dissemination of the Prospectus.

155.    Prestige and its employees and agents, the Individual Defendants and defendant

GTCR, owed Plaintiffs and the other members of the Class the duty to make a reasonable and

diligent investigation of the statements contained in the Prospectus to ensure that such statements

were true and that there was no omission of material facts required to be stated in order to make the

- 69 -

statements contained therein not misleading.  The Underwriter Defendants, as underwriters of the IPO, were required to investigate the representations contained in the Prospectus with due diligence to confirm that it did not contain materially misleading statements or omit to state material facts. Defendants knew of, or in the exercise of reasonable care by their employees and agents, should have known of, the misstatements and omissions contained in the IPO materials, including the Prospectus, as set forth above.

156.    Plaintiffs and other members of the Class purchased or otherwise acquired Prestige common stock pursuant to and/or traceable to the defective Prospectus.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

157.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and members of the Class who hold Prestige common stock purchased in the IPO have the right to rescind and recover the consideration paid for their Prestige common stock and hereby elect to rescind and tender their Prestige common stock to the Defendants sued herein in return for the consideration paid for those securities together with interest thereon.  Plaintiffs and Class members who have sold their Prestige common stock are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

158.    Plaintiffs repeat and reallege only the allegations contained in ¶¶1-62, 80-92, above.

159.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants.  This Count does not contain any allegations sounding in fraud. Moreover, for purposes of this Count, Plaintiffs affirmatively state that they do not claim that

Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

160.    Each of the Individual Defendants was a control person of Prestige by virtue of his position as a director and/or senior officer of Prestige and/or his ownership of Prestige common stock.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Prestige.  They each had the power and authority to cause the issuer to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading statements and omissions in the Prospectus.

161.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.  None of these Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement, including the Prospectus, were true and devoid of any omissions of material facts.  Therefore, by reason of their positions of control, as alleged herein, each of these Defendants is jointly and severally liable to Plaintiffs and the Class as a result of the wrongful conduct alleged herein.

162.    Plaintiffs and the other members of the Class who acquired Prestige common stock pursuant to the Registration Statement and Prospectus did so without knowledge of the materially untrue statements or omission therein.  As a direct and proximate result of the Defendants' wrongdoing, Plaintiffs and the Class members have suffered substantial damages.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act And Rule 10b-5
Promulgated Thereunder Against Defendants Prestige,
Mann, Anderson, GTCR, Doninni and Hemmer**

163.    Plaintiffs purchased Prestige common stock at artificially inflated prices during the Class Period.   The price of Prestige common stock declined significantly when Defendants fraudulent scheme began to be publicly revealed about the Company's declining financial results and financial condition that had been concealed by Defendants' earlier misrepresentations, omissions and other fraudulent conduct, and Plaintiffs were damaged as a result thereof.  Plaintiffs' certifications have been previously submitted in this litigation and are hereby incorporated by reference.  Plaintiffs repeat and reallege each and every allegation contained above.

164.    During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) enable the Company to complete the IPO at artificially inflated prices; and (iii) cause Plaintiffs and other members of the Class to purchase Prestige's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

165.    The Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Prestige's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Each Defendant is sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

- 72 -

166.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Prestige as specified herein.

167.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Prestige's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Prestige and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Prestige securities during the Class Period.

168.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and

(iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

169.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Prestige's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

170.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

171.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

narrowly defined group of Defendants identified above.  Each of the above officers of Prestige, by

virtue of their high-level positions with the Company, directly participated in the management of the

Company, was directly involved in the day-to-day operations of the Company at the highest levels

and was privy to confidential proprietary information concerning the Company and its business,

operations, products, growth, financial statements, and financial condition, as alleged herein.  Said

Defendants were involved in drafting, producing, reviewing and/or disseminating the false and

misleading statements and information alleged herein, were aware, or recklessly disregarded, that the

false and misleading statements were being issued regarding the Company, and approved or ratified

these statements, in violation of the federal securities laws.

172.     As officers and controlling persons of a publicly-held company whose common stock

was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE,

and governed by the provisions of the federal securities laws, the Individual Defendants each had a

duty to disseminate promptly, accurate and truthful information with respect to the Company's

financial condition and performance, growth, operations, financial statements, business, products,

markets, management, earnings and present and future business prospects, and to correct any

previously-issued statements that had become materially misleading or untrue, so that the market

price of the Company's publicly-traded securities would be based upon truthful and accurate

information.  The Individual Defendants' misrepresentations and omissions during the Class Period

violated these specific requirements and obligations.

173.     The Individual Defendants participated in the drafting, preparation, and/or approval

of the various public and shareholder and investor reports and other communications complained of

herein and were aware of, or recklessly disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature.  Because of

their Board membership and/or executive and managerial positions with Prestige, each of the Individual Defendants had access to the adverse undisclosed information about Prestige's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Prestige and its business issued or adopted by the Company materially false and misleading.

174. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

175. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Prestige common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Prestige's business, operations, management and the intrinsic value of Prestige common stock; (ii) enabled the Company to complete an initial public offering of 32.2 million shares, thereby raising more than $515.9 million; and (iii) caused Plaintiffs and other members of the Class to purchase Prestige securities at artificially inflated prices.

176. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Prestige's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Prestige's

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Prestige securities during the Class Period at artificially high prices and were damaged thereby.

177.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Prestige was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Prestige securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

178.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

179.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

180.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181.    The Individual Defendants acted as controlling persons of Prestige within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

182.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

183.    As set forth above, Prestige and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT VI**

**Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

184.     Plaintiffs repeat and reallege each and every allegation contained above.

185.     This Count is brought pursuant to §20(a) of the 1934 Act on behalf of all purchasers of Prestige securities during the Class Period.

186.     Defendants Mann, Anderson, Hemmer and Donnini by virtue of their positions as officers and directors of Prestige, had access to, and were in possession of, material non-public information about Prestige at the time they sold millions of shares of Prestige common stock during the Class Period.

187.     Defendants Hemmer and Donnini, collectively sold 7,737,109 shares in the IPO at $16.00, defendant Mann sold 304,145 shares in the IPO at $16.00 per share and defendant Anderson sold 123,758 shares in the IPO at $16.00 per share. These sales were completed contemporaneously with the purchases of plaintiffs TAPP, Tallahassee, and Charter in the IPO.

188.     Specifically, defendants Donnini and Hemmer are each described in the Propsectus as principals and/or members of defendant GTCR and GTCR Golder Rauner II, L.L.C. ("GTCR II"). According to the Prospectus, GTCR is the general partner of GTCR Partners VI, L.P., the general partner of GTCR Mezzanine Partners, L.P., the general partner of Capital Partners. GTCR II is the general partner of GTCR Partners VIII, L.P. and Co-Invest II. Partners VIII is the general partner of Fund VIII and Fund VIII/B. Accordingly Messrs. Donnini and Hemmer may be deemed to beneficially own the shares owned by the "GTCR Funds."  Defendants Mann and Anderson sold personally-held shares of Prestige common stock in the IPO.

189.    By virtue of their participation in the scheme to defraud investors described in Count IV and their sale of stock while in possession of material, non-public information about Prestige, Defendants violated §10(b) of the 1934 Act and applicable rules and regulations thereunder.

190.    Plaintiffs and all other members of the Class who purchased shares of Prestige common stock contemporaneously with sales of Prestige common stock by Defendants: (i) have suffered substantial damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Prestige common stock as a result of the violations of §10(b) of the 1934 Act and Rule 10b-5 as alleged in Count IV; and (ii) would not have purchased Prestige securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and concealment.  At the time of the purchases by Plaintiffs and the other members of the Class, the fair and true market value of the Prestige securities was substantially less than the price paid by them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the other members of the Class, pray for judgment as follows:

A.    declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying the Class and certifying their counsel as Class Counsel;

B.    awarding Plaintiffs and other members of the Class damages against all Defendants jointly and severally, together with interest thereon;

C.    awarding Plaintiffs and the other members of the Class rescission on Count II to the extent they still hold Prestige common stock, or if sold, awarding rescissory damages in accordance with Section 12(a)(2) of the Securities Act;

- 80 -

D.      awarding Plaintiffs and other members of the Class their costs and expenses of this

litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs

and disbursements; and

E.      awarding Plaintiffs and other members of the Class such other and further relief as

may be just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  December 23, 2005              LERACH COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN (SR-7957)
                                       RUSSELL J. GUNYAN (RG-4724)


                                       _____
                                                  SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       Lead Counsel for Plaintiffs and Chair Executive
                                       Committee

                                       KAPLAN FOX & KILSHEIMER LLP
                                       FREDERIC S. FOX (FF-9102)
                                       JOEL B. STRAUSS (JS-6585)
                                       805 Third Avenue, 22nd Floor
                                       New York, NY  10022
                                       Telephone:  212/687-1980
                                       212/687-7714 (fax)

                                       PASKOWITZ & ASSOCIATES
                                       ROY L. JACOBS
                                       60 East 42nd Street, 46th Floor
                                       New York, NY  10165
                                       Telephone:  212/685-0969
                                       212/685-2306

                                       Members of Executive Committee

- 81 -

## CERTIFICATE OF SERVICE

I, Russell J. Gunyan, hereby certify that that on December 23, 2005, I caused a

true and correct copy of the attached:

> Consolidated Class Action Complaint for Violations of Federal Securities
> Laws

to be served by first-class mail to all counsel on the attached service list.


_____
/s/ Russell J. Gunyan
RUSSELL J. GUNYAN

PRESTIGE BRANDS (LEAD)
Service List - 12/20/2005   (05-0166)
Page 1 of  2

## Counsel For Defendant(s)

John F. Cambria
Alston & Bird LLP
90 Park Avenue
New York, NY  10016
   212/210-9400
   212/210-9444 (Fax)

Todd R. David
Scott P. Hilsen
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA  30309-3424
   404/881-7000
   404/881-7777 (Fax)

B. John Casey
Janet M. Link
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL  60606
   312/876-7700
   312/993-9767 (Fax)

John  Gueli
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-4676
   212/848-4000
   212/848-7179 (Fax)

## Counsel For Plaintiff(s)

Frederic S. Fox
Joel B. Strauss
Kaplan, Fox & Kilsheimer LLP
805 Third Avenue, 22nd Floor
New York, NY  10022
   212/687-1980
   212/687-7714 (Fax)

Samuel H. Rudman
Russell J. Gunyan
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

PRESTIGE BRANDS (LEAD)
Service List - 12/20/2005   (05-0166)
Page 2 of 2

Laurence D. Paskowitz
Roy L. Jacobs
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, NY  10165
   212/685-0969
   212/685-2306 (Fax)